# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 05-2165

———————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District of |
| | * | Nebraska. |
| Tylan Lucas, | * | |
| | * | |
| Appellant. | * | |

———————

Submitted: January 9, 2007
Filed: August 23, 2007

———————

Before LOKEN, Chief Judge, WOLLMAN, BEAM, ARNOLD, MURPHY, BYE, RILEY, MELLOY, SMITH, COLLOTON, GRUENDER, BENTON, and SHEPHERD, Circuit Judges.

———————

MURPHY, Circuit Judge, with whom LOKEN, Chief Judge, and MELLOY, SMITH, and GRUENDER, Circuit Judges, join.

Tylan Lucas, an escapee from the Nebraska prison system returned to custody pursuant to an administrative arrest warrant, was convicted of drug and firearm offenses, attempted obstruction of justice, and one forfeiture count and was sentenced to 25 years in prison. Lucas appeals, arguing that his motions to suppress evidence should have been granted, that there was insufficient evidence to uphold his convictions for conspiracy and attempted obstruction of justice, and that the district

court[1] erred by not dismissing the case under the Speedy Trial Act and by several trial rulings. A panel of this court reversed, holding that the district court should have granted his motion to suppress the evidence found when the warrant was executed. United States v. Lucas, 451 F.3d 492 (8th Cir. 2006). The government's petition for rehearing en banc was granted and the panel opinion vacated. We now affirm.

I.

In October 2003 Lucas escaped from the custody of the Nebraska Department of Correctional Services (Department) while serving a sentence for possession of a controlled substance and for felonious assault with a firearm. He absconded after he was placed on work release, and Harold Clarke, Director of the Department, issued a "Warrant of Arrest (for Escaped Prisoner)" on October 22. Clarke had statutory authority as director to issue warrants for the arrest of escapees from the Department's custody, see Neb. Rev. Stat. § 83-173(11), and he stated in the warrant that he had "reasonable cause to believe" that Lucas had escaped from custody.

On January 4, 2004, Timothy Carmody, a sergeant of the Omaha Police Department and member of its fugitive task force, received a report from Crime Stoppers that Tylan Lucas was staying at 2316 Ogden Street apartment 1 in North Omaha. That address was for a unit on the first floor of a house converted into apartments. Carmody referred the tip to Deputy Gerald Kellogg of the county sheriff's department, and Kellogg met the tipster and they drove by the residence where Lucas had been sighted. At the suppression hearing Kellogg testified that the tipster had reported seeing Lucas at the residence in the preceding 48 hours.

---

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

Later that day officers from the fugitive task force went to the residence. They had learned that the tenant in apartment 1 was Theresa Scaife, and on their arrival a man and woman were heard speaking inside. The officers knocked on the front door, and a woman's voice responded that she needed to get dressed. Scaife opened the door a few minutes later, and the police asked whether Lucas was in the apartment. She denied that he was. The officers told her they believed he was inside and wanted to look for him. Scaife asked whether they had a search warrant. The officers said they did not but that they did have an arrest warrant for Lucas and information that he was living at that address. On that authority they intended to enter the premises and search for him. Scaife then admitted that Lucas was in the apartment, and the officers placed her in their squad car before looking for him.

The officers announced their presence and asked Lucas to come out of the apartment. When he did not, they went inside and found him in the basement dressed in boxer shorts. He was arrested and taken upstairs to the living room. Department policy required that he be dressed because of the winter weather. Deputy Kellogg saw a pair of men's warm up pants in the bedroom adjacent to the living room, picked them up, and asked Lucas if they were his. Lucas replied that they were but he wanted to wear a different pair. After picking up the pants, Kellogg discovered they contained about $2,900 in cash, two bags of crack cocaine, and a bag of marijuana. The officers finished dressing Lucas, and he was taken away for booking.

Scaife was then able to return to the apartment. Sergeant Carmody explained that the officers suspected Lucas had a weapon and other contraband there and asked for her permission to search. Scaife verbally consented to a search and also signed a consent form. In the subsequent search of the apartment the officers found a stolen Ruger revolver and a bag of marijuana.

Lucas was initially charged on January 23, 2004 with four counts – possession with intent to distribute 5 or more grams of crack, possession of a Ruger revolver in

furtherance of possessing with intent to distribute 5 or more grams of crack, possession of a Ruger revolver after having been convicted of assault in the first degree, and a forfeiture count. Lucas moved to suppress the evidence from the search, on the ground that his Fourth Amendment rights had been violated by the officers' illegal entry into Scaife's apartment. The magistrate judge[2] issued a report recommending the motion be denied on the basis that the officers had entered pursuant to a valid arrest warrant and that Scaife had consented to their entry. The district court did not adopt the finding that Scaife had consented to the initial entry, but it denied the motion to suppress on the ground that the officers had authority to enter the apartment since they had an arrest warrant issued by a neutral and detached magistrate. Although Director Clarke was not a judicial officer, the court noted that the warrant was authorized by a Nebraska statute, that Clarke was not directly involved in "ferreting out crimes," and that he was well positioned to determine probable cause for the arrest of an escaped prisoner.

During the pretrial period Lucas continued serving the remainder of his state sentence at the Douglas County Corrections Center where his telephone calls were recorded as part of routine policy. The Omaha police obtained a subpoena for copies of the recordings of these calls, and Lucas moved to exclude evidence of the calls. At a suppression hearing an officer who was familiar with Lucas testified that it was his voice on the recordings. In the recorded conversations the speaker was heard asking several different individuals to claim they owned the Ruger revolver found at Scaife's apartment and offering to pay for their assistance. Lucas's motion to exclude this evidence was denied.

Based on these recordings and letters written by Lucas, the government filed a superseding indictment on March 17, 2004 which charged him with additional

---

[2]The Honorable F.A. Gossett, United States Magistrate Judge for the District of Nebraska.

counts of attempted obstruction of justice and of conspiracy to distribute and possess with intent to distribute 50 grams or more of crack. A second superceding indictment on October 19, 2004 added two more firearm counts: possession of a semiautomatic handgun[3] in furtherance of the conspiracy to distribute 50 grams or more of crack and possession of a semiautomatic handgun after having been convicted of assault in the first degree.

Before trial Lucas filed several other motions. He moved to dismiss the counts charging conspiracy and possession of a semiautomatic handgun. In addition he moved in limine to exclude Fed. R. Evid. 404(b) evidence and moved pro se to dismiss all charges for violation of the Speedy Trial Act. The motions were denied, and the case proceeded to trial. At the close of the government's case and again at the end of trial, Lucas moved to dismiss the charges for possessing a revolver in furtherance of a drug crime and for possessing a semiautomatic handgun in furtherance of the conspiracy to distribute crack. The motions were denied.

After a four day trial the jury found Lucas guilty of attempted obstruction of justice, possession of at least 5 grams of crack with intent to distribute, conspiracy to distribute between 50 and 150 grams of crack, possession of a Ruger revolver in furtherance of the conspiracy, and being a felon in possession of a weapon. He was found not guilty of possessing a semiautomatic handgun in furtherance of the conspiracy and not guilty of being a felon in possession of a semiautomatic handgun. Lucas appeals.

Lucas contends that the district court erred by denying his motion to suppress evidence because the officers' entry into Scaife's apartment was illegal since the arrest warrant had not been issued by a neutral and detached magistrate, but by an executive

---

[3]This gun was not the revolver found in Scaife's apartment, but a different weapon Lucas was charged with possessing in connection with the conspiracy.

officer answering to the governor and without judicial authority, citing Payton v. New York, 445 U.S. 573 (1980). He contends further that the good faith exception to the exclusionary rule should not be extended to uphold the entry. See United States v. Leon, 468 U.S. 897 (1984). The government responds that the requirement for a neutral and detached magistrate has no application here because Clarke's statutorily authorized arrest warrant permitted the police to enter Scaife's home in order to retake Lucas and return him to custody. We review the district court's factual findings for clear error and its legal determinations de novo. United States v. Kelly, 329 F.3d 624, 628 (8th Cir. 2003).

## II.

Lucas contends that under the Fourth Amendment officers cannot enter "a suspect's home in order to make a routine felony arrest" without a warrant or consent, Payton, 445 U.S. at 576, and that the warrant must have been issued by a neutral and detached magistrate who has found "probable cause" and "sufficient evidence . . . that his arrest [was] justified." Id. at 602. The government responds that the Payton rule applies only to routine felony arrests, not to the recapture of a person already convicted of a crime and placed in state custody.

The Constitution generally requires that "someone independent of the police and prosecution," Shadwick v. City of Tampa, 407 U.S. 345, 348 (1972), review a warrant application to determine whether there is "probable cause to believe a citizen guilty" of a crime and to issue an arrest warrant. Id. at 351; see also Coolidge v. New Hampshire, 403 U.S. 443, 449-50 (1971) (similar requirement for search warrant). As the Court has explained, "[t]he Fourth Amendment does not contemplate the executive officers of the Government as neutral and disinterested magistrates. Their duty and responsibility are to enforce the laws, to investigate, and to prosecute." United States v. U.S. Dist. Court, 407 U.S. 297, 317 (1972).

The panel opinion concluded that Clarke as an executive officer was unable to issue a valid warrant, just like the jailer in United States v. Parker, 373 F.3d 770 (6th Cir. 2004). In Parker, the Sixth Circuit suppressed evidence seized pursuant to search warrants issued by a deputy jailer in her alternate capacity as a county trial commissioner. Since she had been appointed as jailer by an executive branch official, she was employed in a law enforcement agency, and the jail had a financial interest in the outcome of the warrant proceedings, she was not neutral and detached. Id. at 773.

Although Director Clarke's role in issuing the arrest warrant for Lucas was quite different from the jailer's issuance of search warrants in Parker, Clarke was not a neutral and detached magistrate in the sense of a judicial officer. He was appointed by the governor, who set his salary and had power to remove him at will. Neb. Rev. Stat. §§ 81-102, -103. Clarke headed a corrections agency, and his duties closely involved him with prisons and prisoners. By law he was responsible "for the custody, control, safety, correction, and rehabilitation of persons committed to the department." Id. § 83-173(3).

The fact that Clarke was not a neutral judicial officer does not end the Fourth Amendment inquiry, however. This case is quite different from the cases on which Lucas relies in which a neutral magistrate was needed to determine probable cause. Here the administrative official responsible for the custody of prisoners issued a warrant to retake an inmate who had already been convicted of a crime beyond a reasonable doubt and had fled from his lawful custody. The standard for issuance of a valid administrative warrant under the Fourth Amendment is different from the

probable cause showing necessary for a warrant to arrest someone suspected of a crime.[4]

The Supreme Court has upheld administrative warrants and has never held that administrative warrants must be issued by a neutral and detached magistrate in the sense of Shadwick or Coolidge. An administrative arrest warrant issued by a district director of the Immigration and Naturalization Service pursuant to a deportation statute led to a valid arrest in Abel v. United States, 362 U.S. 217, 234 (1960). There, the Court recognized the "long-sanctioned practice" and "overwhelming ... legislative recognition" favoring "the propriety of administrative arrest" in such circumstances. Id. at 230, 233. The Court has required that administrative warrants be obtained before inspectors enforcing housing code compliance may lawfully enter and inspect residential units. See Camara v. Mun. Court, 387 U.S. 523 (1967). And in the course of striking down a federal statute as unconstitutional under the Fourth Amendment for authorizing Occupational Health and Safety Administration agents to make warrantless safety inspections, the Court indicated that the requirements for issuance of an administrative warrant are not identical to those for judicial warrants. Marshall v. Barlow's, Inc., 436 U.S. 307, 320 (1978).

The requirements for valid administrative warrants were also examined in Griffin v. Wisconsin, 483 U.S. 868 (1987), a case upholding a Wisconsin law authorizing probation officers to make warrantless searches if there were reasonable grounds to believe a probationer's home contained contraband. The dissent argued that the Constitution required a warrant issued by a neutral member of the judiciary, but the majority explained that administrative search warrants need not be issued by judicial officers, in contrast to "constitutionally mandated judicial warrants." Id. at

---

[4]The arrest warrant here was issued to retake Lucas into custody. It was issued by his custodian rather than by a prosecuting authority, and our conclusion that Lucas's arrest was lawful is independent of any "semantic legerdemain" put forward by the dissent.

877-78. The "neutral magistrate or neutral officer envisioned by our administrative search cases is not necessarily the 'neutral judge' envisioned by the dissent." Id. at 877 n.5 (internal quotation marks and citations omitted). Like the probation officer in Griffin, Director Clarke was "not an impartial magistrate, [but] neither [was] he the police officer who normally conducts searches against the ordinary citizen," for he was charged with retaking an escapee while protecting both "the public interest" and "the welfare of the [escapee]." Id. at 876. Just as the Griffin probation officer had specialized knowledge, Clarke was well positioned to know if a convicted inmate in his custody had escaped. As Director of the Department of Correctional Services, he had access to information about such an escapee and the statutory duty to issue a warrant. See Neb. Rev. Stat. § 83-173 (director "shall" issue warrant for escapee).

Our conclusion that a warrant issued by a neutral and detached magistrate was not required for a lawful entry into Scaife's apartment is consistent with decisions of other circuit courts. A Maryland statute authorizing prison wardens to issue retake warrants for parolees was found by the Fourth Circuit not to violate the Fourth Amendment in Henderson v. Simms, 223 F.3d 267 (4th Cir. 2000). Like the retake warrants in Henderson, Clarke's administrative arrest warrant for escapee Lucas was authorized under a state statute. According to a ruling of the First Circuit, a parole violation warrant issued by the New York parole board and supported by "reasonable cause" permitted a valid arrest consistent with the Fourth Amendment. See United States v. Cardona, 903 F.2d 60 (1st Cir. 1990). Like that parole violation warrant, Clarke's arrest warrant for Lucas was issued by an executive official with legislative authority for the subject matter and was supported by reasonable cause.

Probable cause "in the criminal law sense" is not required for issuance of an administrative warrant, Marshall, 436 U.S. at 320, for in the administrative context probable cause "refer[s] not to a quantum of evidence, but merely to a requirement of reasonableness." Griffin, 483 U.S. at 877 n.4. The reasonableness of the officers' entry into Scaife's apartment must be judged by balancing the government's "need to

[arrest Lucas] against the invasion which the [arrest] entails." Camara, 387 U.S. at 537. Whatever expectation of privacy an escaped convict might have must be weighed against the strong interest the government has in bringing him back into custody.

Like the prison escapee in United States v. Roy, 734 F.2d 108, 112 n.5 (2d Cir. 1984), Lucas "lost his presumption of innocence when he was convicted and incarcerated," and his escape could not expand the very restricted expectation of privacy he had while in the custody of prison officials. Id. at 111-12. Since Roy's presence outside of custody was wrongful, id. at 111, the Second Circuit found he lacked "a legitimate expectation of privacy against the government's intrusion." Id. at 110. Evidence seized without a warrant from his locked trunk was therefore admissible. Id. at 112. Lucas similarly had no right to be in Scaife's apartment, and Nebraska's interest in the present case was even stronger than the state's in Roy because the officers here were acting pursuant to a valid administrative warrant.

As an escapee Lucas had only a minimal expectation of privacy in Scaife's apartment. See Rakas v. Illinois, 439 U.S. 128, 143 n.12 (1978). Prisoners like Lucas who are on work release are subject to special restrictions just like probationers. Their liberty is legitimately constrained because "[p]robation, like incarceration, is a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty." Griffin, 483 U.S. at 874 (internal quotation marks and citation omitted). The state has a duty to protect the community from harm when a probationer or escaped prisoner is "at large." Id. at 875. For these reasons a warrantless search of a probationer's home without probable cause is permissible if it is based on the reasonable suspicion of the probation officer. United States v. Knights, 534 U.S. 112, 121-22 (2001). The officers' entry into Scaife's apartment did not violate the Fourth Amendment since Lucas was a convicted escapee whom they were seeking under the authority of a valid administrative warrant issued by the responsible state official who had reasonable cause to believe that Lucas had escaped.

-10-

Lucas as an escapee from lawful custody had an even more circumscribed expectation of privacy than the probationer in Knights or the parolee in Samson v. California, 126 S. Ct. 2193, 2200 (2006) (state's "overwhelming interest in supervising parolees" justified a warrantless search). Lucas had to sign a personalized plan agreeing to the terms of his work release program before he could participate in it, and these terms required him to return to the community corrections center after work. See Neb. Dep't of Correctional Servs. Reg. 201.06 & app., available at http://www.corrections.state.ne.us/policies/files/201.06.pdf; see also Trial Tr. at 259 (stipulation that Lucas was obligated to return to Omaha Community Corrections Center after work). That Lucas expected to be recaptured wherever discovered is evidenced by his comment to the arresting officers, "Damn, I knew I was going to get caught eventually."

Steagald v. United States, 451 U.S. 204 (1981), is also instructive. In that case the police entered Steagald's home with an arrest warrant for Ricky Lyons, a fugitive who was not present, but the officers discovered evidence incriminating Steagald. The Supreme Court concluded that the search violated Steagald's personal Fourth Amendment rights but that those of Lyons were not affected. Id. at 216. The Supreme Court distinguished the rights of Steagald from those of Lyons, just as we must analyze the respective rights in this case. The Court pointed out that "two distinct interests were implicated by the search at issue here – Ricky Lyons' interest in being free from an unreasonable seizure and petitioner's interest in being free from an unreasonable search of his home." Id. While the arrest warrant would have supported the search for and the seizure of Lyons if he had been there, it did not justify the search that turned up evidence against Steagald. In our case it is Scaife rather than Lucas who was in a position like Steagald's. Clarke's arrest warrant authorized entry into Scaife's home for the purpose of arresting Lucas.

"Reasonableness" is the standard for issuance of an administrative arrest warrant seeking to return a prison escapee to custody, see Camara, 387 U.S. at 539,

-11-

rather than the probable cause requirement for a warrant to arrest a person suspected of crime. Shadwick, 407 U.S. at 351. Clarke's administrative warrant met that standard. We conclude that the entry into Scaife's apartment was reasonable because the Omaha police were acting under the authority of a valid administrative warrant and they had reason to believe Lucas was there. Cf. Payton, 445 U.S. at 602. They had received and sufficiently corroborated a tip that Lucas would be found at Scaife's apartment. Their source had reported seeing Lucas at Scaife's home within the prior 48 hours, and one of the officers had driven by the residence with the tipster to verify as much of the information as possible. The balance of interests here tips in favor of the state since Nebraska's interest in recapturing a convicted criminal who had absconded from its custody is a strong one, and Lucas had no legitimate expectation of privacy while hiding out in Scaife's residence.[5]

The dissent errs by overlooking Lucas's status as an escapee and focusing solely on the fact that the officers entered a residence. Its statement that "expectation of privacy tests . . . concern places rather than persons" is contrary to the teaching of the Supreme Court, for "the Fourth Amendment protects people, not places." Katz v. United States, 389 U.S. 347, 351 (1968). As the Fifth Circuit explained in United States v. Taylor, 482 F.3d 315, 318-19 (5th Cir. 2007), another case involving a warrantless search of a girlfriend's residence in which the defendant was hiding, the

---

[5]Lucas and the dissent claim that the government waived its right to argue that he lacked a reasonable expectation of privacy. The waiver doctrine is most appropriately applied when the government has taken inconsistent positions during the course of the litigation and such inconsistency has affected the factual record. See United States v. Hansen, 652 F.2d 1374, 1381-83 (10th Cir. 1981); cf. Steagald, 451 U.S. at 210-11; United States v. Morales, 737 F.2d 761, 763 (8th Cir. 1984). In this case the government has never claimed that Lucas had a reasonable expectation of privacy in Scaife's apartment, and our conclusion that he lacked such an expectation is based solely on facts which the parties do not dispute. We are merely applying the "well-settled principle" that a district court may be affirmed on any ground supported by the record. United States v. Pierson, 219 F.3d 803, 807 (8th Cir. 2000) (Beam, J.).

defendant had no greater Fourth Amendment rights in her place than he would have had in his own, citing Katz and Minnesota v. Olson, 495 U.S. 91 (1990). The Taylor court applied the totality of circumstances approach taken in Knights to conclude that the search had not violated the Fourth Amendment since Taylor had no special protection in his girlfriend's residence, the officers had a misdemeanor arrest warrant for him and reason to believe he was present in her residence, and Taylor's rights were limited by his supervised release status.

Because Lucas's reasonable expectation of privacy was limited by his status as an escapee and the officers possessed both a valid administrative warrant and reasonable cause to believe Lucas was in Scaife's apartment, we conclude that his Fourth Amendment rights were not violated by the entry of the officers into the apartment and his subsequent arrest.[6] Nor were they violated by the search incident to his arrest and the subsequent search of Scaife's apartment with her consent. Since Lucas does not have standing to assert Scaife's Fourth Amendment rights, any issue of hers is not before us. See Pierson, 291 F.3d at 806 (Fourth Amendment rights are personal and cannot be vicariously asserted); see also Rakas, 439 U.S. at 133-38; Taylor, 482 F.3d at 319.

III.

Lucas also appeals several issues related to his trial. First, he argues that the district court erred by not dismissing the conspiracy charge for lack of particularity. He objects that the indictment only referred to coconspirators "known and unknown to the grand jury." Lucas contends there can be no assurance that he was convicted of the offense charged by the grand jury because the government introduced evidence of several possible conspiracies. The government responds that it offered sufficient

---

[6]In light of this conclusion we need not address the government's argument based on United States v. Leon, 468 U.S. 897 (1984).

evidence that Lucas, Nathaniel Grant, James Edwards, and others joined in a single crack distribution conspiracy.

To prove a single conspiracy the government relied in part on the testimony of Grant and Edwards, two gang members who had previously pled to narcotics offenses. Grant testified that he sold crack to Lucas on numerous occasions during October 2003 and saw him carrying a semiautomatic handgun during these dealings. Edwards testified that between December 2003 and early January 2004 Lucas sold him crack and that Lucas owned a semiautomatic handgun. The possibility that there were other unknown individuals involved in the drug dealing does not mean there was more than one conspiracy. The law recognizes that "[a] single conspiracy may exist even if the participants and their activities change over time, and even if many participants are unaware of, and uninvolved in, some of the transactions." United States v. Benford, 360 F.3d 913, 914 (8th Cir. 2004) (citation and internal quotation marks omitted). We conclude that the indictment was constitutionally sufficient, that the district court did not clearly err in concluding there was sufficient evidence of one conspiracy, and that it did not abuse its discretion in refusing to give a multiple conspiracy instruction.

Lucas makes two objections relating to his conviction for attempted obstruction of justice. He argues first that the phone recordings on which the charge was based should have been excluded from evidence. Telephone calls may be intercepted without a warrant if one of the parties to the call gives "prior consent." 18 U.S.C. § 2511(2)(c). There was uncontradicted evidence at the suppression hearing that the Douglas County Corrections Center gave each inmate a handbook stating that all outgoing telephone calls were monitored except those to attorneys. The Center affixed placards to the inmate telephones warning that the calls were recorded, and an audio message repeated the warning before each call. In a similar situation in United States v. Horr, 963 F.2d 1124, 1126 (8th Cir. 1992), we concluded that medical center inmates had impliedly consented to the recording of their phone calls. The district court was entitled to find from the notice given to inmates that any reasonable person

in Lucas's position should have known of the policy. We conclude that the district court did not abuse its discretion in admitting the recordings into evidence.

Lucas next contends that there was insufficient evidence to convict him of attempted obstruction of justice. He argues that the statute under which he was convicted, 18 U.S.C. § 1512(c)(2),[7] applies only to direct conduct obstructing an official proceeding, not to an attempt to influence others to obstruct. Because Lucas failed to make this argument below, we review for plain error and find none. The only appellate decision we have found construing this statute, United States v. Reich, 479 F.3d 179, 185 (2d Cir. 2007), does not support his argument. See Johnson v. United States, 520 U.S. 461, 468 (1997) (plain error is one "clearly contrary" to established law at time of appeal). After viewing the evidence in the light most favorable to the government and giving it the benefit of every reasonable inference, we can only reverse if no reasonable jury could have found Lucas guilty beyond a reasonable doubt. United States v. Carlisle, 118 F.3d 1271, 1273 (8th Cir. 1997). An attempt requires "(1) an intent to engage in criminal conduct, and (2) conduct constituting a 'substantial step' toward the commission of the substantive offense which strongly corroborates the actor's criminal intent." United States v. Joyce, 693 F.2d 838, 841 (8th Cir. 1982). There was sufficient evidence for a reasonable jury to find that Lucas asked both Shawnna Hilmer and Jaime Bonnett to claim ownership of the firearm found in Scaife's apartment and that each understood his request to be in earnest. This was enough to prove that Lucas took a "substantial step" toward obstruction of justice. See United States v. Mims, 812 F.2d 1068, 1077-78 (8th Cir. 1987).

Lucas also objects to the admission of evidence of his past drug dealing and gun possession under Fed. R. Evid. 404(b). The government filed a pretrial notice of intent to introduce such evidence in order to establish motive, intent, plan and design

---

[7] 18 U.S.C. § 1512(c)(2) provides: "Whoever corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both."

in relation to the drug and firearm charges. Police reports of Lucas's prior arrests were introduced and there was testimony by people who dealt drugs with him before he was incarcerated in November 2000. Lucas contends that the evidence was not similar in kind or close in time to the charged offenses and that any probative value of the evidence was outweighed by its prejudicial effect.

We review the admission of Rule 404(b) evidence for abuse of discretion and will "reverse only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." United States v. Thomas, 398 F.3d 1058, 1062 (8th Cir. 2005), quoting United States v. Howard, 235 F.3d 366, 372 (8th Cir. 2000). When a defendant has denied ownership of seized drugs or the intent to distribute them, evidence of past drug related activity is admissible to prove both knowledge and intent. United States v. Love, 419 F.3d 825, 828 (8th Cir. 2005). Since Lucas put his knowledge and intent at issue, and the government had the burden of proof on these elements, admission of the 404(b) evidence was proper. See United States v. Foster, 344 F.3d 799, 801 (8th Cir. 2003). Furthermore, his drug related activities were not so remote in time to be irrelevant. See Love, 419 F.3d at 828; Thomas, 398 F.3d at 1063; Foster, 344 F.3d at 802.

Lucas asserts that his Sixth Amendment right to compulsory process was violated when the district court did not allow all of the testimony he wanted to present about John Ezell. Ezell had been living with Theresa Scaife before Christmas 2003. One theory of Lucas's defense was that it was Ezell who had left the Ruger revolver and crack in Scaife's apartment either accidentally, or purposely because he was angry that Lucas was staying there and wanted to incriminate him. Lucas hoped to introduce evidence that Ezell had four arrests related to crack and handguns, but the government contended that the evidence was inadmissible. A criminal defendant's right to compulsory process is violated if relevant evidence is excluded without sufficient justification. United States v. Bernhardt, 642 F.2d 251, 253 (8th Cir. 1981); see also

Taylor v. Illinois, 484 U.S. 400, 410 (1988). We review the court's evidentiary decision for abuse of discretion. United States v. LeGrand, 468 F.3d 1077, 1080 (8th Cir. 2006).

The district court allowed evidence to support Lucas's theory of defense. He was permitted to question Scaife about her relationship with Ezell and about whether the revolver and drugs belonged to him. See United States v. Becht, 267 F.3d 767, 773 n.7 (8th Cir. 2001), quoting Old Chief v. United States, 519 U.S. 172, 182-83 (1997). Evidence that is cumulative or "remote and speculative" may be excluded under Fed. R. Evid. 403 to avoid confusing or misleading the jury, see United States v. DeNoyer, 811 F.2d 436, 440 (8th Cir. 1987), and we conclude that the district court did not abuse its discretion by not permitting Lucas to solicit all the evidence he wished to present. See United States v. Yarns, 811 F.2d 454, 456 (8th Cir. 1987).

Finally, Lucas argues that the district court violated the Speedy Trial Act, 18 U.S.C. §§ 3161-3174. The Act requires that trial begin within 70 days after a defendant is charged or makes an initial appearance unless the running of the time is stopped for reasons set out in the statute. One authorized period of delay is triggered if a district court expressly finds that the ends of justice served by granting a continuance outweigh the interests of the public and the defendant in a speedy trial. See id. § 3161(h)(8). Shortly before Lucas's trial was scheduled to begin, the government moved for a continuance because the prosecutor was scheduled to start a different trial the day before the Lucas case. The magistrate judge denied the motion on the grounds that it was untimely and did not comply with the local rules. The government appealed to the district court, explaining that the other trial involved numerous witnesses from outside the district and one from another country.

The district court issued an order on September 27, continuing the trial date from September 28 to November 9, 2004 for the following reasons:

[C]onsidering all of the relevant circumstances, the Court concludes that the motion should be granted in the interest of justice. The Court finds that, under the circumstances presented, the ends of justice outweigh the interest of the public and of the Defendant in a speedy trial and failing to grant a continuance would result in a miscarriage of justice. 18 U.S.C. §§ 3161(h)(8)(A) & (h)(8)(B).

A superseding indictment with additional charges was later filed, and on October 25 another order was entered continuing Lucas's trial to January 4, 2005 on the ground that a "failure to grant additional time might result in a miscarriage of justice." On December 17 Lucas filed a pro se motion to dismiss all the charges under the Speedy Trial Act. The motion was denied on December 20, and trial began as planned on January 4.

Lucas argues that Zedner v. United States, 126 S. Ct. 1976 (2006), requires a district court to detail its reasons for granting an ends of justice continuance, that the court failed to do so in its September continuance order, and that that violation is not susceptible to harmless error analysis. In the context of Speedy Trial Act rulings, we review a district court's legal conclusions de novo, its factual findings for clear error, and its ultimate determination for an abuse of discretion. See United States v. Duranseau, 26 F.3d 804, 808 (8th Cir. 1994).

The district court made explicit findings to support its ends of justice continuance on September 27, finding that "failure to grant [a continuance would] result in a miscarriage of justice." That factor is one of the permissible reasons for a continuance, 18 U.S.C. § 3161(h)(8)(B)(i), and the court also balanced the ends of justice and the interests of the parties and public. While there could have been more detailed findings, its order was sufficient to show compliance with the Act, particularly in the context of the government's stated reasons for requesting the continuance. This record is unlike the situation in Zedner where the district court "made no mention of the Act and did not make any findings to support exclusion."

126 S. Ct. at 1982. We conclude that Lucas has not shown that the district court abused its discretion in granting the September 27 continuance or that the district court erred by not dismissing the case for violating the Speedy Trial Act.

IV.

In sum, we conclude that the Speedy Trial Act was not violated, that the district court did not err by denying Lucas's suppression motions or his motions to dismiss the conspiracy and obstruction of justice charges for insufficient evidence, and that the district court did not abuse its discretion in other trial rulings or in its jury instructions. For these reasons we affirm the judgment of the district court.

SHEPHERD, Circuit Judge, with whom COLLOTON and BENTON, Circuit Judges, join, concurring in part and concurring in the judgment.

I concur in Parts I and III of the Court's opinion and that portion of Part II that holds that, as an escapee, "Lucas had no legitimate expectation of privacy while hiding out in Scaife's residence," ante at 12. Therefore there can be no Fourth Amendment violation in this case. See Smith v. Maryland, 442 U.S. 735, 740 (1979) ("[T]his Court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action."); United States v. Bach, 310 F.3d 1063, 1066 (8th Cir. 2002) ("[I]n order to find a violation of the Fourth Amendment, there must be a legitimate expectation of privacy in the area searched and the items seized. If there is no legitimate expectation of privacy, then there can be no Fourth Amendment violation.") (citing Smith, 442 U.S. at 740); see also Minnesota v. Olson, 495 U.S. 91, 97 n.5 (1990) ("'[T]he Fourth Amendment protects people, not places,' and provides sanctuary for citizens wherever they have a legitimate expectation of privacy.") (quoting Katz v. United States, 389 U.S. 347, 351 (1967)); United States v. Kuenstler, 325 F.3d 1015, 1020 (8th Cir. 2003) ("The Fourth Amendment protects 'against

-19-

unreasonable searches and seizures,' but its protections are personal and cannot be asserted by persons lacking a 'legitimate expectation of privacy' in the place searched.") (quoting Rakas v. Illinois, 439 U.S. 128, 143 (1978)). I find unnecessary the plurality's analysis with regard to the validity of the administrative arrest warrant and the reasonableness of law enforcement's belief that Lucas was present in the apartment prior to entry and therefore decline to join it.

BYE, Circuit Judge, concurring in part, dissenting in part, and concurring in the judgment.

I join in the dissents of Judge Beam and Judge Riley to the extent they conclude part II of the Court's analysis is flawed. But I concur in the Court's judgment affirming the district court's denial of Lucas's motion to suppress the evidence found at Lucas's primary residence because, in my judgment, while the administrative warrant was invalid, the Leon[8] good-faith exception to the exclusionary rule saves the evidence. Finally, I concur in part III of the Court's opinion, which addresses the remainder of the issues raised in this appeal.

I

The majority contends "the [G]overnment has never claimed that Lucas had a reasonable expectation of privacy in Scaife's apartment" and therefore did not waive "its right to argue that he lacked a reasonable expectation of privacy." Ante at 12 n.5. Why would the government ever argue a defendant had a reasonable expectation of privacy? Such an argument would be raised by a defendant challenging a warrantless search, not by the government where the government claims the search was executed pursuant to a valid warrant.

---

[8]United States v. Leon, 468 U.S. 897, 913 (1984).

In fact, Lucas argued, in his pre-trial briefing prior to the suppression hearing, that he had "standing to challenge the officers' warrantless entry of the residence to effect his arrest" based on his status as an overnight guest at his girlfriend's house. Def.'s Br. Support Mot. Suppress at 2. Did the Government challenge this claim of standing? No. Instead, the Government responded: "A valid arrest warrant 'carries with it the authority to enter the residence of the person named in the warrant in order to execute the warrant so long as the police have a reasonable belief that the suspect resides at the place to be entered and that he is currently present in the dwelling.'" Gov't Br. Opposition Mot. Suppress at 5 (quoting United States v. Clayton, 210 F.3d 841, 843 (8th Cir. 2000)). The Government also argued in the alternative that Lucas's girlfriend had given consent to search the premises, quoting United States v. Matlock, 415 U.S. 164, 170 (1974): "[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." Far from leaving open the door that Lucas lacked a reasonable expectation of privacy at the residence, the focus of the testimony elicited by the Government at the suppression hearing went to show law enforcement officers arrested Lucas at his primary residence—proof that supported the Government's position the law enforcement officers had a reasonable belief Lucas resided there, which, *coupled* with a valid arrest warrant, would make the search of the premises valid. In other words, all along, the premise underpinning the Government's defense of the search was that Lucas's standing to challenge a warrantless search (which was accepted by the Government) was irrelevant because officers possessed a valid arrest warrant and possessed a reasonable belief he was at the premises searched.

At oral argument before the panel in this case, the Government conceded it had never before argued Lucas lacked a reasonable expectation of privacy due to his escapee status:

Judge Beam: As an escapee from custody, was a warrant necessary?

-21-

| | |
|---|---|
| Government: | Well, your honor, at this point in time that is, that's an issue and— |
| Judge Beam: | It, well, it wasn't an issue that you raised, was it? |
| Government: | No.  It wasn't. |

The Government further volunteered at oral argument before the panel that the only issues raised concerning the suppression issue were (1) whether the arrest warrant was valid, and (2) if not valid, whether the officers relied on the warrant in good faith.  The record demonstrates the Government presented its Johnny-come-lately theory—in essence, that the Director of Correctional Services is detached and neutral *enough* for the purposes of issuing an arrest warrant because an escapee lacks a reasonable expectancy of privacy anywhere—for the first time in its petition for rehearing en banc.

Generally, both the government and defendants are barred from raising Fourth Amendment arguments for the first time on appeal.  See, e.g., United States v. Alvarez-Sanchez, 511 U.S. 350, 360 n.5 (1994) ("Finding no exceptional circumstances that would warrant reviewing a claim that was waived below, we adhere to our general practice and decline to address respondent's Fourth Amendment argument."); Giordenello v. United States, 357 U.S. 480, 487 (1958) (finding, where the government defended the legality of the petitioner's arrest "by relying entirely on the validity of the warrant," to allow the government to argue for the first time before the Supreme Court that even a warrantless arrest would have been valid "would unfairly deprive petitioner of an adequate opportunity to respond"); United States v. Nee, 261 F.3d 79, 86 (1st Cir. 2001) (holding, by failing to raise it to the district court, the government waived its argument the subjective intent of the officers was irrelevant for establishing probable cause); United States v. 22249 Dolorosa St., 167 F.3d 509, 512 (9th Cir. 1999) (holding the government waived its argument on appeal that the defendant did not have standing to challenge a search when it failed to raise the

argument to the district court); <u>United States v. Gonzales</u>, 79 F.3d 413, 419 (5th Cir. 1996) (per curiam) (holding the government waived its standing argument when it was put on notice the defendant would claim a privacy interest).

As Judge Beam explains in his dissent, in <u>United States v. Steagald</u>, the Supreme Court determined that the government had waived its right to raise a standing issue in circumstances similar to those presented here. 451 U.S. 204, 208-11 (1981). In reaching its conclusion, the <u>Steagald</u> Court stated:

> the Government was initially entitled to defend against petitioner's charge of an unlawful search by asserting that petitioner lacked a reasonable expectation of privacy in the searched home . . . . The Government, however, may lose its right to raise factual issues of this sort before this Court when it has made contrary assertions in the courts below, when it has acquiesced in contrary findings by those courts, or when it has failed to raise such questions in a timely fashion during the litigation.

<u>Id.</u> at 209-10, <u>quoted with approval and applied in</u> <u>United States v. Morales</u>, 737 F.2d 761, 764 (8th Cir. 1984). Here, the Government referenced case law and facts at the suppression hearing and in defense of the magistrate's report and recommendation that show its theory of the case was Lucas lived at the house entered and it was his "primary residence." The Government arguably benefitted from similar testimony at trial in linking Lucas to the drugs and firearm found at the residence (as opposed to Lucas's theory that someone else had placed the firearm in the residence). The Government also made no objection to the district court's finding Lucas was a co-occupant of the residence. Moreover, the Government acquiesced in the magistrate and district court's winnowing of the issues to two: (1) the validity of the warrant; and (2) in the absence of a valid warrant, the applicability of the <u>Leon</u> good-faith exception. Finally, as noted above, the Government expressly conceded at oral argument before the panel it never argued below, as it now does, that Lucas's escapee status justified a warrantless (or warrant-light) search of the premises. In light of the

-23-

above, and in the absence of exceptional circumstances, it is my view the Government waived the right to challenge Lucas's standing to challenge the validity of the search.[9] Thus, I respectfully dissent from part II of the Court's opinion for the reasons articulated in Judge Beam's dissent.

II

The now-vacated panel decision in this case noted the Leon good-faith exception exists because the exclusionary rule is not meant to deter magistrate judge errors—it is meant to curb overzealous law enforcement officials. I agree. Because the panel found the Nebraska Director of Correctional Services was too intertwined with Nebraska law enforcement officials and the state executive branch to be "detached and neutral," the panel concluded the Leon good-faith exception did not apply. Similarly, in his dissent, Judge Beam contends the Leon good-faith exception is "inapplicable" because the warrant was not issued by a neutral magistrate. This conclusion is at odds with the Supreme Court's interpretation of Leon in Krull v. Illinois, 480 U.S. 340 (1987).

Less than three years after deciding Leon, the Supreme Court handed down Krull. The Krull Court described the question in the case as "whether a good-faith exception to the Fourth Amendment exclusionary rule applies when an officer's reliance on the constitutionality of a statute is objectively reasonable, but the statute is subsequently declared unconstitutional." 480 U.S. at 342. The Illinois statute in

---

[9]Our case law suggests plain error review is inapplicable under these circumstances. See United States v. Harrison, 393 F.3d 805, 806 (8th Cir. 2005) ("Waiver extinguishes a potential "error" under [Federal Rule of Criminal Procedure] 52(b)."). In any case, I would decline such review because any failure to consider the Government's belated argument does not "seriously affect[] the fairness, integrity, and public reputation of judicial proceedings." United States v. Montanye, 996 F.2d 190, 193 (8th Cir. 1993) (en banc).

question required licensed automobile dealers to permit state officials to inspect vehicle records "at any reasonable time during the night or day" and to allow "examination of the premises of the licensee's established place of business for the purpose of determining the accuracy of required records." Id. at 343. Pursuant to the statute, a Chicago police officer entered a licensee's property and asked to see certain records. The officer then requested and received permission to search cars on the property.[10] The officer determined some of the cars had been reported stolen, seized the cars, and placed an employee of the licensee under arrest. The holder of the license was later arrested and charged with criminal violations of Illinois motor vehicle statutes.

The state trial court found the warrantless administrative search of licensees unconstitutional and suppressed the evidence seized. The Appellate Court of Illinois held the officer's good-faith reliance on the statute might be relevant and remanded the matter to the trial court. On remand, the state trial court adhered to its original decision and found the good faith of an officer is relevant only when he acts pursuant to a warrant. The government appealed the trial court's decision directly to the Supreme Court of Illinois which affirmed. The Supreme Court of Illinois held the statute unconstitutional because it vested too much discretion in state officials to decide who, when, and how long to search. The court also held the good-faith exception did not apply to a procedural statute directly authorizing warrantless searches.

The United States Supreme Court reversed the Supreme Court of Illinois decision. The Krull Court stated the Leon exception applies where an officer's reliance on a judge-issued warrant is objectively reasonable, even though the warrant is ultimately found to be defective. The Krull Court noted Leon created the exception

---

[10]Consent was an issue early on in the case but was not an issue before the Supreme Court.

because (1) the exclusionary rule was historically designed to deter police misconduct rather than punish the errors of judges, (2) there was no evidence judges were inclined to subvert or ignore the Fourth Amendment, and (3) "of greatest importance to the Court, there was no basis 'for believing that exclusion of evidence seized pursuant to a warrant [would] have a significant deterrent effect on the issuing judge or magistrate.'" Krull, 480 U.S. at 348. In considering these factors, the Krull Court first concluded suppressing evidence obtained pursuant to an invalid statute "would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts on a warrant." Id. at 349. Second, the Krull Court also declared: "although [judges and legislators] clearly serve different functions in the criminal justice system . . . . legislators, like judicial officers, are not the focus of the rule." Id. at 350. The Krull Court found no evidence the legislators in question were inclined to subvert the Fourth Amendment and stated: "Although legislators are not 'neutral judicial officers,' as are judges and magistrates, neither are they 'adjuncts to the law enforcement team.'" Id. at 35-51. Third, the Krull Court found the greatest deterrent to the enactment of such legislation was not to exclude evidence in a particular case but to invalidate the statute itself. The Krull Court stated: "[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against the 'substantial social costs exacted by the exclusionary rule.'" Id. at 352-53 (citing Leon, 468 U.S. at 907).

In addition, the Krull Court noted Leon had set forth two situations in which the good faith exception would not apply: where the issuing magistrate wholly abandoned his judicial role or where the warrant was so facially deficient the executing officers could not have reasonably presumed it to be valid. Similarly, the Krull Court found evidence seized pursuant to a *statute* later invalidated would not qualify for the good-faith exception if the legislature (1) "wholly abandoned its responsibility to enact constitutional laws," or (2) if the statute's "provisions are such that a reasonable officer should have known that the statute was unconstitutional." Id. at 355. The Krull Court found neither of these factors present in its review of the Illinois statute. To the extent

the statute vested too much discretion in state officials to decide who, when, and how long to search, the <u>Krull</u> Court found "the additional restrictions on discretion that might have been necessary are not so obvious that an objectively reasonable police officer would have realized the statute was unconstitutional without them." <u>Id.</u> at 359-60. Therefore, the <u>Krull</u> Court concluded that the officer had "relied, in objective good faith, on a statute that appeared legitimately to allow a warrantless administrative search of [the licensee's] business."[11] <u>Id.</u> at 359.

Given the broad language used in <u>Krull</u>, even though, in my judgment, the Nebraska statute at issue here, Neb. Rev. Stat. § 83-173, is unconstitutional (at least as applied in this case to search the house of the escapee named in the arrest warrant where the Government does not contest the escapee's standing to challenge a warrantless search), the seizure of evidence incident to Lucas's arrest—based on an arrest warrant issued pursuant to the invalid statute—resulted from the officers' objectively reasonable reliance on the statute which required the issuance of the warrant. The administrative warrant in question specifically references § 83-173 for its authority. In § 83-173(11), the Nebraska legislature has mandated: "The Director of Correctional Services shall . . . [i]ssue or authorize the issuance of a warrant for the arrest of any person committed to the department who has escaped from the custody

---

[11]The <u>Krull</u> Court noted in a footnote: "The answer to this question might well be different when police officers act outside of the scope of the statute, albeit in good faith." <u>Krull</u>, 480 U.S. at 360. It is arguable the officers here acted outside the scope of Lucas's arrest warrant by using the warrant to enter a private residence. If they acted outside the scope, the <u>Krull</u> holding might not apply to their conduct, even if they acted in good faith. <u>Id.</u> But the Supreme Court has held, at least where a judicially issued arrest warrant is involved, an arrest warrant can be used to enter a private home where the officer holding the warrant has reasonable suspicion the person named in the arrest warrant is in the home. <u>Payton</u>, 445 U.S. at 576. Here, the officers executing the arrest warrant did have a reasonable suspicion Lucas was in the house, so it appears they were acting within the scope of the arrest warrant when they entered the house and seized Lucas.

of the department." No deterrent effect would result from suppressing the evidence discovered as a result of the execution of the administrative arrest warrant at issue, which affords no discretion to the Director of Correctional Services (which is another reason why he is not neutral or detached as set forth in Shadwick v. City of Tampa, 407 U.S. 345 (1972)). If this court invalidated the warrant, Nebraska law enforcement officers would continue to rely on other warrants authorized by other statutes. Krull, 480 U.S. at 349 ("Penalizing the officer for the [legislature's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." (alteration in original) (paraphrasing Leon, 468 U.S. at 921)). And there is no evidence here the Nebraska legislature was trying to subvert the Fourth Amendment in authorizing the administrative arrest warrant for escapees. Further, if the statute or warrant were ruled invalid, the Nebraska Legislature would be sent a strong message to more carefully craft legislation in the future.

Finally, I submit it is not apparent from the face of the statute the administrative warrant is invalid. The Supreme Court has held warrantless arrests of escapees are valid if the arrest is made in public. United States v. Watson, 423 U.S. 411, 423-24 (1976). Thus, had the statute authorized the *warrantless* arrest of an escapee in a public space, it would have been valid (albeit unnecessary). It is unreasonable to expect an officer to know, because the statute instead added the additional step of having an executive branch officer issue the arrest warrant, the warrant would be invalid where used to enter a private residence. Further, there are a host of "re-take" state statutes and at least one federal statute authorizing the Attorney General to issue arrest warrants (arrest warrants for aliens pending deportation under 8 U.S.C. § 1226(a)) that authorize non-judicial arrest warrants. Thus, despite my position the search of Lucas's primary residence was conducted pursuant to an invalid administrative warrant, I conclude it was objectively reasonable for officers, in arresting Lucas in his primary residence, to rely on the statute that authorized the issuance of the arrest warrant. As a result, I disagree with Judge Beam's view that the good-faith exception was inapplicable in this case. See, e.g., United States v. Hunt,

893 F.2d 1028, 1031-32 (9th Cir. 1990) (holding the <u>Leon</u> good-faith exception applied to save evidence seized as part of the execution of an arrest warrant issued by the Oregon Department of Corrections pursuant to its authority under an Oregon statute and citing the <u>Krull</u> decision in support), <u>opinion withdrawn in part on other grounds</u>, 925 F.2d 1181 (9th Cir. 1991).  I would apply the exception to save the evidence seized from Lucas's residence.  Thus, like the majority, I would affirm the district court but for the very different reasons articulated in this concurrence.

RILEY, Circuit Judge, concurring in part, dissenting in part, and concurring in the judgment.

Judge Beam, Judge Murphy, and Judge Bye have prepared thorough and persuasive opinions.  As a member of the original three-judge panel, I agree with Judge Beam that the government has mended its hold by raising new arguments in its petition for rehearing en banc.  See <u>Steagald v. United States</u>, 451 U.S. 204, 208 (1981); <u>In re Hen House Interstate, Inc.</u>, 177 F.3d 719, 724 (8th Cir. 1999) (en banc) (rejecting a newly raised argument made for the first time in a petition for rehearing en banc).  The majority recognizes the panel was correct in its ruling on the issue actually presented to the panel on appeal–the warrant was not issued by a neutral and detached magistrate.  Therefore, I join the conclusions of Judge Beam's dissent, except for the conclusion regarding <u>United States v. Leon</u>, 468 U.S. 897 (1984).  I am persuaded by Judge Bye's concurrence and his conclusion <u>Leon</u> and <u>Krull v. Illinois</u>, 480 U.S. 340 (1987), save the day for the government's evidence seized from Lucas's residence.  Thus, I join Judge Bye's concurrence affirming the district court's denial of Lucas's motion to suppress.  I also concur in part III of the majority opinion.

BEAM, Circuit Judge, with whom WOLLMAN and ARNOLD, Circuit Judges, join, dissenting, and with whom BYE and RILEY, Circuit Judges, join in part.

This is a garden variety separation of constitutional powers case gone awry.  A majority of the judges in regular active service in this circuit employed late blooming,

previously unannounced legal concepts, advanced by the government for the first time in its petition for rehearing en banc to vacate the unanimous opinion of the three-judge panel and to create an en banc court. The en banc panel, contrary to existing Supreme Court and circuit precedent, now accepts these new government theories to administer to Tylan Lucas what the court apparently believes are his just desserts for being a bad person and an escaped felon. To reach this result, the court performs a Texas "Sidestep"[12] around clearly established and plainly articulated Fourth Amendment jurisprudence as established in <u>Payton v. New York</u>, 445 U.S. 573 (1980) and <u>Shadwick v. City of Tampa</u>, 407 U.S. 345 (1972). From this unjust result, I respectfully dissent.

## BACKGROUND

Tylan Lucas was convicted of two felonies by the State of Nebraska in 2000. He was sentenced to prison for each crime. In 2003, in anticipation of his release from incarceration, he was assigned a job in the Nebraska Department of Correctional Services' work-release program. In October of 2003, Lucas walked away from his work-release assignment and an administrative warrant was almost immediately issued for his arrest. Thereafter, Lucas began to reside with Theresa Scaife at her apartment in Omaha.

---

[12]This is the dance routine dramatizing the Texas Governor's reluctance to follow existing law as made famous in the 1978 Broadway play *The Best Little Whorehouse in Texas*. Scott Cain, <u>Cincinnati: The Best Little Whorehouse in Texas</u>, http://www.talkinbroadway.com/regional/cincy/cincy19.html.

He was taken into custody within his home[13] at 2316 Ogden Street by the *Omaha Police Department's Metro Fugitive Task Force*[14] on January 4, 2004. He was returned to state control and housed at the Douglas County, (Nebraska) Correctional Center. Evidence gathered at the time of the arrest was later used by the United States to prosecute Lucas for the offenses at issue in this case. This evidence is the subject of the motion to suppress under consideration in this appeal.

The officers used a warrant issued by Harold Clarke, the Director of Correctional Services, an executive officer of the State of Nebraska, to force entry into Lucas's home without consent. Clarke was statutorily authorized to and did issue the warrant authorizing and *directing* Lucas's seizure and return to state custody. Neb. Rev. Stat. § 83-173(11). Accordingly, any commissioned police officer "authorized by law to make arrest[s]" in Nebraska having knowledge of the walk away or being apprised of the contents of Clarke's warrant, with or without actual use of the administratively issued document, was authorized to arrest Lucas if found on the street or in any other place not affording him a protectable expectation of privacy as defined by the Constitution. But, neither Nebraska statutes and regulations nor Clarke's administrative arrest warrant purport to authorize or could authorize a nonconsensual entry into Lucas's home to arrest him for a felony or to search for evidence of new federal drug crimes, especially federal crimes for which neither reasonable suspicion nor probable cause existed at the time of entry. Whether or not the warrant authorized

---

[13]The evidence indicates that Lucas lived at this address with Scaife and the Omaha Police considered it his "primary residence." Officer Carmody, an Omaha Police Sergeant, testified that the Omaha Police consider a place where a person is believed to be residing a primary residence. The government has not disputed that this Ogden Street primary residence was Lucas's home at all times relevant to this litigation.

[14]The Task Force is a multi-agency task force encompassing the United States Marshals Service, the Douglas County Sheriff's Office, the Omaha Police Department, the Nebraska State Patrol and the Council Bluffs Police Department.

Lucas's return to Nebraska's custody to serve the remainder of his previously imposed felony sentences or to stand trial for his 2003 felony escape is not at issue here. The plurality opinion authored by Judge Murphy contends that Lucas had signed a "personalized plan" that required him to return to the Omaha Community Corrections Center after work. I find nothing in the record that supports the existence of such an agreement signed by Lucas. But, I find this irrelevant. At all times relevant here, Lucas was *chargeable* with a Class III felony for the crime of escape when he walked away from work release, with or without an agreement to return. Neb. Rev. Stat. § 28-912(5).

## DISCUSSION

I.    Waiver

The government argued in the district court that Director Clarke was the "neutral and detached magistrate" required by <u>Payton</u> or, if not, that the police entered Scaife and Lucas's home by consent. The district court rejected the government's "consent" argument, which ruling was not appealed, but accepted the government's neutral and detached magistrate contention. On appeal to the three-judge panel, the government renewed its argument that Clarke was the neutral and detached magistrate required by Supreme Court precedent and, if not, that a "good faith" exception applied. The neutral magistrate contention was rejected by the panel, a rejection now conceded by the en banc court to have been correct. This made the good faith issue inapplicable. <u>United States v. Leon</u>, 468 U.S. 897, 914 (1984).[15]

---

[15]Judge Bye in his dissent and concurrence takes exception to my contention that a good faith exception under <u>Leon</u> is inapplicable in this case. He cites <u>Illinois v. Krull</u>, 480 U.S. 340 (1987), in support of his contrary view. I agree with almost every part of Judge Bye's discussion of <u>Krull</u>. I disagree only with his conclusion that <u>Krull</u> somehow opens the door to a determination that the evidence at issue in this case is admissible under the teachings of <u>Leon</u>. As Judge Bye appears to concede in

-32-

Because it obviously believed that a <u>Payton</u> warrant was necessary to validate Lucas's arrest and search, the government reasserted its neutral and detached magistrate argument (or an argument that the warrant was close enough to the real thing to do the job) in its en banc papers. Undeterred in its quest to prosecute Lucas for federal drug crimes, the government in its petition for rehearing en banc also raised for the first time two new and different legal theories. First, the government asserted that as an at-large felon, Lucas had a diminished expectation of privacy that permitted the arrest, the residential search and the property seizure notwithstanding the strictures of <u>Payton</u> and <u>Shadwick</u>. The government's second new theory asserted that the warrant was a valid administrative warrant that obviated the requirements of <u>Payton</u> and <u>Shadwick</u> altogether.

As noted, the en banc court correctly rejects the neutral and detached magistrate argument. Further, the en banc court accepts and adopts the government's new legal theories over Lucas's well-articulated objections that the government waived these arguments by failing to raise them in the first instance. Neither of these government suppositions were presented to nor argued before the three-judge panel.

---

footnote 11 of his dissent and concurrence, the Supreme Court requires that when the police enter a private residence, a <u>Leon</u>-qualifying warrant must be issued by a "neutral magistrate" to "provide[] the detached scrutiny" necessary to accord "a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime." <u>Leon</u>, 468 U.S. at 913-14 (quotation omitted). There was no such warrant here. Third, as also seemingly conceded by Judge Bye, Nebraska Revised Statute § 83-173 *as applied in this case* is unconstitutional. And, as <u>Krull</u> suggests, the proper deterrent in such a situation is for the court to invalidate the statute–the greatest deterrent to enactment of an unconstitutional statute is the power of the court to invalidate because invalidation informs the legislature of its constitutional error and affects admissibility of subsequently obtained evidence. <u>Krull</u>, 480 U.S. at 352-53. Thus, at the bottom line, <u>Krull</u> is clearly not the pathway to a <u>Leon</u> good faith exception in this case.

In <u>Steagald v. United States</u>, 451 U.S. 204, 208 (1981), the government was not permitted to assert an "expectation of privacy" argument not raised in a timely fashion. While there are instances in which this circuit has considered issues raised for the first time on *appeal*, such situations have involved purely legal arguments requiring no additional factual development or requiring an affirmative showing of manifest injustice. <u>Orion Fin. Corp. v. Am. Foods Group, Inc.</u>, 281 F.3d 733, 740 (8th Cir. 2002). Of course, factual considerations are required to evaluate both of these newly minted legal theories and the issue of manifest injustice, if any, runs toward Lucas and away from the government.

"Arguments and issues raised for the first time on appeal are generally not considered," especially when "no good reason has been advanced to depart from that rule." <u>Aaron v. Target Corp.</u>, 357 F.3d 768, 779 (8th Cir. 2004). The reason advanced by government counsel at oral argument was as follows:

> Frankly, I don't think we anticipated the nature and the scope of the [three-judge] court's ruling in this matter. And again, I stand by the works of my colleagues and the position of my office, but had I been writing the brief [on appeal], I would have taken a different tack . . . and different argument.

This essentially amounts to a confession by the government that they thought they would win with the arguments advanced but when they did not, they needed to assert a new theory in their petition for rehearing en banc.

Likewise, matters raised for the first time in a *reply brief* on appeal have been routinely and peremptorily rejected by this court. <u>Bearden v. Lemon</u>, 475 F.3d 926, 930 (8th Cir. 2007). And, prior to the unusual procedure followed by the en banc court in this case, the precedent of this circuit has been clear. Then Chief Judge Bowman, writing in <u>In re Hen House Interstate, Inc.</u>, 177 F.3d 719 (8th Cir. 1999),

rejected a new assertion made in a petition for rehearing en banc and noted that a "party [first] raising [an] argument on en banc rehearing would 'be allowed to deprive the panel of the ability to address the issue first.'" Id. at 724 (quoting Stupak-Thrall v. United States, 89 F.3d 1269, 1275 n.4 (6th Cir. 1996)). Adapting Justice O'Connor's statement in Coleman v. Thompson, 501 U.S. 722, 747 (1991), to this situation, it may correctly be said that consideration of these new issues for the first time by the en banc court will have the effect of making the district court trial and the three-judge panel's consideration of the issues asserted in the first appeal merely a "tryout on the road," leaving open the option of presenting a newly created script when the en banc court becomes the intended audience. Indeed, after intensive computerized research of existing databases, I have been unable to find a single instance in this circuit when an en banc panel has allowed new issues it believed to be controlling to be raised for the first time by the losing party in a petition for rehearing en banc, except, of course, matters of subject matter jurisdiction or Article III standing. Considerable circuit precedent is being extinguished today by this en banc opinion.

II.     Arrest

The "physical entry of [Lucas's] home is the chief evil against which the wording of the Fourth Amendment is directed." United States v. United States Dist. Ct., 407 U.S. 297, 313 (1972). While "[t]he Fourth Amendment protects the individual's privacy in a variety of settings[,] [i]n none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home–a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their . . . houses . . . shall not be violated.'" Payton, 445 U.S. at 589 (omissions in original). It is this constitutional language that "unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" Id. at 589-90 (quoting Silverman v.

United States, 365 U.S. 505, 511 (1961)) (alterations in original).  In Payton, the Supreme Court determined that the Fourth Amendment, applied to the states through the Fourteenth Amendment, "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." Id. at 576.  And, a warrant for such purpose or for the purpose of a search for and seizure of property within the home  may be issued only by an official who is "neutral and detached" and "capable of determining whether probable cause exists for the requested arrest or search."  Shadwick, 407 U.S. at 350.

> The right of officers to thrust themselves into a home is . . . a grave concern, not only to the individual but [also] to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by *a judicial officer*, not by a policeman or government enforcement agent.

Johnson v. United States, 333 U.S. 10, 14 (1948) (emphasis added).  But, an escaped felon who has been arrested with a defective warrant does not get a free pass; he may be returned to jail and he must still stand trial.  Payton, 445 U.S. at 592, n.34. However, evidence found and seized during such arrest and entry is subject to an exclusionary rule analysis and may be inadmissible at trial.  Id. at 591-92.

Even though an administrative warrant based specifically upon Lucas's escape from work release was used to force entry into his home, the government  contends in its petition for rehearing en banc that "[t]he [Clarke] warrant was not based on a new criminal charge."  The court en banc appears to join this contention when it says in support of the newly created administrative warrant theory, which theory I will discuss in more detail shortly, "[t]he standard for issuance of a valid administrative warrant under the Fourth Amendment is different from the probable cause showing necessary for a warrant to *arrest someone suspected of a crime*."  Ante at 7 (emphasis added).

It is more than obvious that the Fourth Amendment prohibited police entry into Lucas's home if he was not suspected of a crime. It is equally obvious that breaching the privacy of his home to arrest him for a suspected felony required compliance with Payton and Shadwick. However, adherence to these cases did not occur.

The en banc court concedes that the three-judge panel was correct in finding that Clarke's warrant did not pass muster under Payton. It says

> Although Director Clarke's role in issuing the arrest warrant for Lucas was quite different from the jailer's issuance of search warrants in [United States v.] Parker, [373 F.3d 770 (6th Cir. 2004)], Clarke was not a neutral and detached magistrate in the sense of a judicial officer. He was appointed by the governor, who sat his salary and had power to remove him at will. Neb. Rev. Stat. §§ 81-102, -103.

Ante at 7. To extract themselves from this constitutional dilemma, the government and the court en banc advance this "no new crime" argument, a clearly spurious contention under the facts of this dispute. But, even if correct, it leads them nowhere.

The government and the court do not tightly reason the details of their position. Presumably the contention relies upon a diminished or nonexistent expectation of privacy approach which in some way relates to Lucas's year 2000 convictions and sentences. In other words, they seem to say that a mantle of criminality carrying with it the evaporation of constitutional protections hovered over Lucas, even in his work-release assignment, until his year 2000 sentences had expired. Accordingly, then, they say, it was this continuing vestment of illegality, not his more recent escape felony, that permitted Lucas's in-home arrest. Of course, neither fact nor precedent support this theory. Indeed, case-based reasoning counsels to the contrary. See Griffin v. Wisconsin, 483 U.S. 868, 873 (1987) ("A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'"); Hudson v. Palmer, 468 U.S. 517, 524 (1984) (noting that while imprisonment carries

-37-

with it the circumscription of some rights "persons imprisoned for crime enjoy many protections of the Constitution").

First the facts. The "warrant of arrest," issued by Director Clarke was "for [2003] escaped prisoner" Tylan Lucas. It referred to his underlying convictions and sentences of January and June 2000 and noted that Lucas had been "delivered to the Nebraska Department of Correctional Services on March 1, 2000, [and] has [now] escaped from the custody of the Department." It further "authorized and *directed* [the] arrest of said *escapee*." (Emphasis added). The escape set forth in the warrant resulted when Lucas failed to return from this work-release assignment to community corrections following *temporary leave* granted for work release for a limited period. See Neb. Rev. Stat. § 28-912(1). It was this warrant that was used to force a nonconsensual entry into the residence of Theresa Scaife and Lucas at 2316 Ogden Street, Omaha, Nebraska. At that time, Lucas was arrested by Omaha Police Department Task Force officers, as permitted and required by Nebraska law, for escape, a Class III felony and not for unstated continuing obligations arising from his year 2000 sentences or for violation of any work release administrative rules established by Nebraska statutes or duly promulgated agency regulations.[16]

----

[16]In footnote 4, ante at 7, the plurality opinion concedes, at least by implication, that its several conclusions are erroneous if Tylan Lucas was arrested for a felony at 2316 Ogden Street in Omaha. Although it makes no real difference as I point out below, to dispel the erroneous contention that the administrative warrant was issued only to "retake" Lucas, I attach a copy of the document to this dissent as Appendix A. To buttress its arrest arguments, the plurality appears to contend that the words "arrest" and "retake" have different meanings in this dispute. At best, this finding is an act of semantic legerdemain, that is, it advances a difference without a distinction to reach a predetermined result while steadfastly resisting the application of clearly established Fourth Amendment law. And, unfortunately, Judge Shepherd's concurrence seems also to incorporate elements of this same fiction. United States v. Sager, 881 F.2d 364 (7th Cir. 1989), addresses this point. Sager, a parolee, contended that as such he could not be subject to an "arrest warrant." Id. at 366. Although the parole statute, 18 U.S.C. §§ 4201 et seq., referred to by the Sager court has been

repealed effective November 2005, as a result of the Sentencing Reform Act of 1984, the Seventh Circuit correctly analyzes the issue for our purposes:

> In support of his position, Mr. Sager invites our attention to the statutory language. The statute dealing with parole violations, 18 U.S.C. § 4213, empowers the Parole Commission to "issue a warrant and *retake* the parolee." 18 U.S.C. § 4213(a)(2) (emphasis added). By contrast, Rule 4, dealing with the apprehension of a person wanted to answer a criminal charge, employs the word "arrest." Fed. R. Crim. P. 4. Similarly, 18 U.S.C. § 3606, dealing with the apprehension of probation violators and those on supervised release, speaks in terms of "arrest." Therefore, Mr. Sager argues, section 1071 is not applicable because there was no outstanding *arrest* warrant for Carlos Aubrey at the time Mr. Sager allegedly concealed him.

Id. at 365 (footnote omitted).

The Seventh Circuit then said:

> While it is true that a parolee is "in custody," it is also true that he retains a legally cognizable liberty interest that is significantly greater than that enjoyed by one who is incarcerated. See Morrissey v. Brewer, 408 U.S. 471, 482 (1972). To deprive him of that liberty interest and place him in a custodial status is indeed to arrest him, as that term is usually understood. We must assume that Congress intended the term to be given such a common-sense meaning. Certainly, this conclusion is not undercut simply because Congress did not use the term "arrest" in section 4213 when it was dealing exclusively with the process of parole revocation. There, without unnecessarily limiting the ambit of the section, Congress was able to employ the more descriptive phrase "retake." However, even in that section, Congress manifested, in the later subsections of section 4213, its understanding that the execution of a "warrant to retake" effectuates an "arrest." The physical deprivation of liberty described in subsection (d) certainly constitutes a sufficient deprivation of liberty to constitute

-39-

In State v. Coffman, 330 N.W.2d 727 (Neb. 1983), the defendant walked away from work release and was arrested and charged under Nebraska statute section 28-912(1). The defendant contended, "cunning[ly]" the court noted, that "work release [was] a form of parole" and that, accordingly, there was insufficient evidence to convict him of the crime of "escape." Id. at 728-29. The Nebraska Supreme Court, again citing the precise "temporary leave" language set forth above, rejected Coffman's argument that work release is parole (calling it variously absurd, farcical and frivolous) and said "for the purposes of determining whether one has escaped it is but 'temporary leave,'" id. at 729, as defined in the statute and "when [Coffman] did not return . . . he had obviously escaped." Id. He was properly arrested and charged according to the Nebraska court. Thus, the Nebraska Supreme Court has made clear that Lucas, like Coffman, committed a new felony and was arrested in his home for the offense–with a defective warrant.

Now the precedent. Ignoring that the warrant clearly targeted the commission of the new crime of escape, the government contends, and the en banc court seemingly agrees, that, with or without a warrant, Lucas's home, because he was a prison escapee, afforded him only a diminished (or non-existent in the view of some)

---

an "arrest." Indeed, the Parole Board and other courts of appeals have characterized this event as an arrest.

Id. at 366-37 (footnotes omitted).

Tylan Lucas, as a work-release assignee, even in escapee status, had a "legally cognizable liberty interest that is significantly greater than that enjoyed by one who is [confined within a prison] incarcerated." Id. at 366. This is especially true because he is now being confined, at least in large part, for prosecution for a new federal drug crime on the basis of the unconstitutionally gathered evidence, not for his year 2000 offenses or for the crime of escape.

measure of constitutionally protected privacy.[17]  Lucas, says the government, is a prison escapee from whom the public must be protected.[18]  Indeed, it says, the government had a duty to apprehend this at-large felon.  Both the duty to apprehend and diminished privacy theories have to rely on Lucas being regarded, even in his home, as the "trespasser on society" referred to in dicta in United States v. Roy, 734 F.2d 108, 111 (2d Cir. 1984).  Roy's facts reject this long discredited rationale.

Roy involved the search of the passenger compartment and trunk of an automobile, not a home.  Id. at 108.  Thus, the automobile exception recognized in California v. Carney, 471 U.S. 386 (1985), was clearly in play.

> "[T]he guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of Government, as recognizing a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be *quickly moved* out of the locality or jurisdiction in which the warrant must be sought."

Id. at 390 (quoting Carroll v. United States, 267 U.S. 132, 153 (1925)) (alteration in original).  "The capacity to be 'quickly moved' was clearly the basis of the holding in

---

[17]The plurality opinion says "[a]s an escapee Lucas had only a minimal expectation of privacy in Scaife's apartment."  Ante at 10.  See also Judge Shepherd's concurrence.

[18]In footnote 5, ante at 12, the plurality opinion and Judge Shepherd, in apparent agreement, contend that the "government has never claimed that Lucas had a reasonable expectation of privacy in Scaife's apartment."  As carefully and correctly noted by Judge Bye in his dissent and concurrence, the record clearly demonstrates the inaccuracy of this statement.

-41-

Carroll, and our cases have consistently recognized ready mobility as one of the principal bases of the automobile exception."  Id.

Further, Judge Friendly, concurring in Roy, said

I am not at all convinced that Roy's Fourth Amendment claims should be dismissed on the ground that, because he had escaped from prison, he had no expectation of privacy "that society is prepared to recognize as 'reasonable'."  Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).  When Justice Harlan's much-quoted observation is read in context, it becomes apparent that he was speaking of the places where society would be prepared to recognize an individual's reasonable expectation of privacy, not adumbrating a doctrine whereby certain classes of persons could be denied Fourth Amendment protections that would otherwise extend to them.

Roy, 734 F.2d at 112 (footnote omitted).  Hudson, 468 U.S. 517, enlightens this same issue.  The Supreme Court noted that "while persons *imprisoned* for crime enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the circumscription or loss of many significant rights."  Id. at 524 (emphasis added).  The Supreme Court further said:

We have not before been called upon to decide the specific question whether the Fourth Amendment applies within a prison cell, but the nature of our inquiry is well defined.  We must determine here, as in other Fourth Amendment contexts, if a "justifiable" expectation of privacy is at stake.  Katz v. United States, 389 U.S. 347 (1967).  The applicability of the Fourth Amendment turns on whether "the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action."  Smith v. Maryland, 442 U.S. 735, 740 (1979), and cases cited.  We must decide, in Justice Harlan's words, whether a prisoner's expectation of privacy in his prison cell is the kind of expectation that "society is prepared to recognize as 'reasonable.'"  Katz, supra, at 360, 361 (concurring opinion).

-42-

Id. at 524-25 (footnotes omitted).[19]  Thus, while Fourth Amendment rights are personal, United States v. Pierson, 219 F.3d 803, 806 (8th Cir. 2000), it is abundantly clear that the expectation of privacy tests applied by the court in the implementation of the Fourth Amendment concern places rather than persons.[20]  Certainly, Lucas had a constitutionally supported expectation of privacy in his home that he may not have had in his prison cell or in his automobile or while using a telephone booth or a telephone wired to a pen register.  Accordingly, Roy is inapposite to the government's and the en banc court's expectation of privacy contentions and the court supplies absolutely no precedent to the contrary.

---

[19]While the Supreme Court in Hudson found no expectation of privacy inside the prison cell, the Court has not addressed the Fourth Amendment rights of prisoners outside the cell, even while in an incarcerated status.  See Thompson v. Souza, 111 F.3d 694, 699 (9th Cir. 1997) ("The Supreme Court has not decided whether prison inmates retain rights cognizable under the Fourth Amendment."). The Ninth Circuit has determined that incarcerated prisoners do have some Fourth Amendment protections, dependent upon the prison context.  Michenfelder v. Sumner, 860 F.2d 328 (9th Cir. 1988) (examining reasonableness of strip search under Fourth Amendment).  Likewise, other circuits have made similar holdings.  See Peckham v. Wisconsin Dep't of Corr, 141 F.3d 694, 697 (7th Cir. 1998) (incarcerated prisoners do enjoy some Fourth Amendment protections against strip searches); Franklin v. Lockhart, 883 F.2d 654, 655-56 (8th Cir. 1989) (same).  The considerations of the Supreme Court in Hudson involved the confinement of individuals guilty of antisocial criminal and violent conduct, the prevention of the introduction of drugs into the premises, the ability of inmates to conceal contraband in their cells, and the need to maintain a sanitary environment.  However, none of these concerns apply to individuals who are free to come and go on work release assignments.  Indeed, none apply outside the prison yard.

[20]For example, see  California v. Carney, 471 U.S. 386 (1985) (automobile); Hudson v. Palmer, 468 U.S. 517 (1984) (prison cell);  Payton v. New York, 445 U.S. 573 (1980) (home); Smith v. Maryland, 442 U.S. 735 (1979) (pen register); Katz v. United States, 389 U.S. 347 (1967) (telephone booth).

-43-

III.    Administrative Warrant

With regard to the government and the plurality opinion's administrative warrant emanations, the court advances ten cases in support of its analysis. With one exception, none involve a home search by a police agency. The one exception is directly contrary to controlling Supreme Court precedent. I will briefly discuss each case.

Abel v. United States, 362 U.S. 217 (1960), a case that actually supports Lucas, arose out of a non-criminal custodial detention using an administrative warrant issued by the Director of the Immigration and Naturalization Service (INS) as a preliminary to Abel's deportation as an illegal alien. Id. at 218. Evidentiary "seizures did not occur in connection with the exertion of the criminal process against [Abel]." Id. Abel's immigration restraint occurred in a New York hotel room by action of INS operatives. Prior to this, the Federal Bureau of Investigation (FBI), the only police agency involved, was informed that Abel was suspected of espionage. The FBI asked permission to interview Abel before any immigration detention. This venture proved unfruitful and the FBI then deferred to INS agents who seized him. After Abel had "agreed to check out of the hotel," the FBI asked hotel management for permission to search the room, which permission was granted, and a search for evidence to make a criminal case of espionage was undertaken. Id. at 224-25. The Supreme Court emphasized that any administrative search by INS agents was to look for "documentary evidence of alienage." Id. at 226-28. Of perhaps even more importance, the Fourth Amendment validity of the administrative warrant was not considered by the Court because Abel failed to raise the issue in the lower courts. Id. at 230. In sum, Abel provides little support for any of the en banc court's rulings.

Camara v. Municipal Court, 387 U.S. 523 (1967), also substantively supports Lucas. The case  involved an alleged violation of section 503 of the San Francisco (California) Building Code, a "part of a regulatory scheme which [was] essentially

civil rather than criminal in nature" according to the California District Court of Appeal. Id. at 528 (quotation omitted). And, a violation of any part of the Code was but a "misdemeanor." Id. at 527 n.2. But even in these circumstances the Supreme Court required the use of a warrant reviewed and issued by a neutral magistrate, id. at 532, stating:

> "The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent."

Id. at 529 (quoting Johnson v. United States, 333 U.S. 10, 14 (1948)). The Court further said, "[i]t is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior," id. at 530 (footnote omitted), and that even the most law-abiding citizen has an interest in preventing entry into his home without a warrant, even for civil purposes. Id. at 530-31.

The en banc court substantively ignores the principal thrust of Henderson v. Simms, 223 F.3d 267 (4th Cir. 2000), a "qualified immunity" case that presents none of the issues at large in this case. Henderson is a 42 U.S.C. § 1983 case in which three validly released inmates who were subject to "'mandatory supervision,' a release status similar to parole," id. at 269, were mistakenly reincarcerated for a number of days through use of administrative retake warrants authorized by Maryland law. The inmates sued individual state officers alleging violation of the Fourth and Fourteenth Amendments. While the Fourth Circuit stated that a few days of "reincarceration" using a retake warrant based upon findings specifically delineated by Maryland statute did not violate the Fourth Amendment, the court also opined at length that if it did, the court was "convinced that [the Fourth Amendment] rights were not clearly established

-45-

at the time of the seizures." Id. at 273. This case offers exceedingly thin gruel as nourishment for the en banc court's Fourth Amendment emanations.

In United States v. Cardona, 903 F.2d 60 (1st Cir. 1990), which the two-judge majority characterized as "Griffin Redux," the First Circuit validated a police search of Cardona's Rhode Island residence through the use of a parole violation warrant issued by the New York parole board. But, as noted by the Cardona dissent, "the majority distorts both the substance and method of [F]ourth [A]mendment jurisprudence." Id. at 69 (Bownes, J., dissenting). This, according to the dissent, is because the Cardona court strains to extend Griffin's "'special needs' exception from searches by parole administrators to seizures by police officers, a situation clearly not covered, and arguably forbidden, by the language of Griffin." Id. The dissent is clearly correct that Griffin is restricted to administrator's arrests and searches based upon detailed and pervasive regulations put in place by state statute and court order. Thus, Cardona is irrelevant to Lucas's situation.

The warrentless search in United States v. Knights, 534 U.S. 112 (2001), was specifically consented to through a signed agreement arising from a court order granting probation, id. at 114, and in Samson v. California, 126 S. Ct. 2193 (2006), the parolee was searched and seized while walking on the street, not in his home. And while the en banc court cites these two cases for the proposition that "an escapee from lawful custody [has] an even more circumscribed expectation of privacy than [probationers] and [parolees]," such words or inferences appear in neither of the opinions and as applied to this case are palpably incorrect. Likewise, the court's statement that Rakas v. Illinois, 439 U.S. 128, 143 n.12 (1978), stands for "a minimal expectation of privacy" for Lucas at his home is not supported by the cited footnote. Indeed, a full examination of the note establishes a contrary proposition.

Marshall v. Barlow's, Inc., 436 U.S. 307 (1978), an Occupational Safety and Health Act (OSHA) regulation case cited by the court, notes that a lower standard for

the issuance of an administrative warrant stems from "relatively unique circumstances" involving certain industries with "such a history of government oversight that no reasonable expectation of privacy could exist" for the owner of the business. Id. at 313 (citation omitted). But, the Supreme Court has specifically noted that the Camara-Marshall definition of administrative probable cause is not "[p]robable cause in the criminal law sense." Id. at 320. Indeed, when "seeking evidence to be used in a criminal prosecution, the usual standard [of probable cause] will apply." Michigan v. Tyler, 436 U.S. 499, 508 (1978) (alteration in original) (quotation omitted).

Griffin v. Wisconsin, 483 U.S. 868 (1987), comes closest to supporting the en banc court's administrative warrant position. But, in the final analysis, it is inapplicable to Lucas's situation.

Joseph Griffin, a probationer, had his home searched without a warrant. The supervisor of Griffin's probation officer received a tip that Griffin's apartment might contain contraband. Based upon this information, he authorized Griffin's probation officer to conduct a search of Griffin's home, in which the supervisor participated.

> Wisconsin law puts probationers in the legal custody of the State Department of Health and Social Services and renders them 'subject . . . to . . . conditions set by the court and rules and regulations established by the department.' Wis. Stat. § 973.10(1) (1985-1986). One of the Department's regulations permits any probation officer to search a probationer's home without a warrant as long as his supervisor approves and as long as there are 'reasonable grounds' to believe the presence of contraband.

Id. at 870-71 (omission in original). To protect the probationer's Fourth Amendment rights, "[t]he rule provides that an officer should consider a variety of factors in determining whether 'reasonable [constitutional] grounds exist'" to search. Id. at 871.

Justice Scalia writing for a five-member Court in <u>Griffin</u>, noted that a state's operation of a probation system or other possible plans, including, specifically, a work-release program, present "'special needs' beyond normal law enforcement" activities, <u>id.</u> at 873-74, because they are "a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty." <u>Id.</u> at 874 (quotation omitted). However, "[a] probationer's [and a work release walk away's] home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" <u>Id.</u> at 873. It is important to note that in <u>Griffin</u>, the Wisconsin Supreme Court allowed a search of the probationer's home "because [Griffin's] probation diminishes [his] reasonable expectation of privacy." <u>Id.</u> at 872. Upon review by the United States Supreme Court, this "new principle of law" adopted by the Wisconsin court was pointedly not "embrace[d]." <u>Id.</u> Accordingly, these "special needs" beyond the normal need for law enforcement are employable only when "the [usual] warrant and probable-cause requirement[s] [are] impracticable." <u>Id.</u> at 873 (quotation omitted). Additionally, it seems certain that there must be in place, as in Wisconsin, a state-enacted regulatory scheme that satisfies the Fourth Amendment's reasonableness requirements and the entry, detention and search must be carried out entirely by administrative officers under the authority of the state's regulations. <u>See id.</u> at 873-75.

While the direct facts of <u>Griffin</u> encompass a probationer (as opposed to a work release walk away) and a residential search for contraband (as opposed to a residential arrest and search incident thereto), there is little doubt, even giving the government and the court en banc the case's best gloss, that <u>Griffin</u> establishes legal principles fully applicable to Lucas. Thus, the following analysis controls the outcome of this case. The usual warrant and probable cause requirements were fully practical. There was nothing that prohibited the securing of the Ogden Street residence while a judicial officer was consulted. The probation supervisor's approval of the probation officer's search can probably be considered a reasonable substitute for Director Clarke's administrative warrant. The supervisor's approval was directed to an agency

employee (the searching probation officer) but Director Clarke's directions were addressed only to police personnel authorized by law to make arrests. The supervisor's approval was based upon a finding of reasonable grounds to believe that there was contraband in Griffin's home but Clarke's warrant was based upon a finding that Lucas "had escaped from . . . custody," not that he could or would be found at his home. However, I concede that the Omaha police officers developed reasonable suspicion that he was at his home on Ogden Street. The Griffin supervisor's actions were based upon Wisconsin's comprehensive administrative rules regime. But, there is no showing in the record that Nebraska has any administrative agency procedures that are at all comparable to the Wisconsin scheme. Indeed, a search of the record and research beyond the record reveals a contrary environment.[21] The Wisconsin approval

---

[21]Griffin stresses the completeness of Wisconsin's probation scheme as promulgated by statute and regulation. The statutory and regulatory scheme under-pinning Nebraska's work-release program is not comparable. Nebraska Revised Statute § 83-183(1) provides that individuals in custody of the Department of Correctional Services should be put into the work force to aid their rehabilitation. The same statute requires that the Director of the Department of Correctional Services "shall make rules and regulations governing the hours, conditions of labor, and the rates of compensation of persons committed to the department." Neb. Rev. Stat. § 83-183(2). Generally, "[i]t is the Department's policy to provide . . . employment programs to those inmates who are in need of such . . . programs." 68 Neb. Admin. Code Ch. 7, § 002 (2007). Other than this general statement, the Nebraska Administrative Code's chapter for the Department of Correctional Services is silent on the administration of work release. However, more detailed regulations may be found at http://www.corrections.state.ne.us/policies/index.html. These administrative regulations, promulgated by the Director of the Department of Correctional Services, contain various provisions regarding the criteria and approval process for participation in work-release programs, universal job requirements, worker job descriptions, pay scales, performance evaluation, job termination, overtime, and even excused and non-excused absences. See Nebraska Department of Correctional Services Administrative Regulations 109.01, 113.18, 201.07, and 209.02. However, as far as I have found, these regulations contain nothing similar to those of Wisconsin regarding authority to "arrest," "retake" or search within the home of a prisoner who walks away from his work-release job.

and search was undertaken and completed by state probation officers but Lucas was arrested in his home by agents of an Omaha Police Department task force, not Department of Corrections employees, and through use of a warrant defective under Payton.

Finally, and most importantly, the Nebraska legislature has affirmatively deemed escape a Class III felony rather than an administrative rules violation, and, as interpreted by State v. Coffman, has made Lucas's arrest an apprehension for a "routine felony" requiring a warrant that passes constitutional muster under Payton. Accordingly, the evidence seized in Lucas's home must be suppressed.

IV.     Theresa Scaife

The court's rhetoric that Lucas has no standing "to assert Scaife's Fourth Amendment" rights is beside the point. The record establishes that the intruding police officers were ultimately concerned with Scaife's connection with drugs found in her coat in the residence and with a weapon found under the mattress of the only bed in the premises. Except for the limited "non-prosecution" agreement she has with the United States, Appendix at 21, she, too, is at risk of prosecution for state and federal drug crimes, especially, for instance, for possession or conspiracy to possess illegal drugs for her own use, if not for distribution.

At the time Scaife refused to give the police permission to enter, she was not suspected of committing a crime nor was she on parole, probation or in an escape status. Nonetheless, if the fruits of this search are declared valid, Scaife and many other similarly situated individuals in this circuit who share an abode with an alien, OSHA or housing code violator, parolee, probationer or escapee, will have little if any basis to exclude evidence in a criminal prosecution. See Georgia v. Randolph, 547 U.S. 103 (2006) (*physically present* co-occupant's refusal to permit entry makes search unreasonable as to him); United States v. Davis, 932 F.2d 752 (9th Cir. 1991) (non-

probationer co-occupant cannot suppress evidence found in jointly used portions of residence, with or without inquiry as to ownership by police).

## CONCLUSION

The police arrived at the home of Theresa Scaife and Tylan Lucas and used an administrative arrest warrant that concededly did not pass <u>Payton v. New York</u> constitutional muster to enter, arrest and search Lucas. The court, acting upon new theories advanced in the petition for rehearing en banc, finds these acts to be constitutional.

In doing so, the court offers a series of inapposite and distinguishable cases supposedly authorizing this entry because the administrative warrant was constitutionally sufficient or because Lucas had a limited expectation of privacy in his home as a result of his escape status. This is error.

Lucas is not a model citizen. And it is almost certain that a valid warrant would have been issued by a neutral and detached magistrate, if requested, making the requirement seem but a technicality. Nonetheless, even escapees have the right to expect the benefits of the rule of law. These benefits were denied him by the Omaha Police Department and are being denied him by the court en banc today. The evidence at issue should be suppressed.

I dissent.

_____

## STATE OF NEBRASKA

### DEPARTMENT OF CORRECTIONAL SERVICES



I Terry R. Ewing certify that this document is a true and accurate copy of the original Warrant of Arrest *Terry R. Ewing* Dated this 26 Day of *February* 2004

## WARRANT OF ARREST

### (FOR ESCAPED PRISONER)

TO ANY SHERIFF, CONSTABLE, POLICE OFFICER, OR PEACE OFFICER AUTHORIZED BY LAW TO MAKE ARREST:

WHEREAS, The Director, Nebraska Department of Correctional Services, has reasonable cause to believe that Tylan Lucas        Number    53476

a convicted felon and prisoner of the State of Nebraska who was sentenced on

January 31, 2000 _____ to a _1 to 5 years_ _____ term on a charge of

June 14, 2000 _____ to a _6 to 10 years(CC)_ term on a charge of

_____ Possession of Controlled Substance · from _____ Douglas _____ County, Nebraska,

_____ Assault First Degree _ from _____ Douglas _____ County, Nebraska,

and subsequently delivered to the _____ Nebraska Department of Correctional Services _____ on March 1, 2000, has escaped from the custody of the Department of Correctional Services; NOW, THEREFORE, it is ordered that any sheriff, constable, police officer, or peace officer to whom this WARRANT OF ARREST is issued is hereby authorized and directed to arrest said escapee, and hold him/her in custody for the Nebraska Department of Correctional Services.

This WARRANT OF ARREST is issued upon the authority vested in the Director, Nebraska Department of Correctional Services, as provided in Nebraska Revised Statute, Section 83-173, Reissue 1994.

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

_____ October 22, 2003 _____
Date of Issuance

_____ *[signature]* _____
Director

UPON APPREHENSION NOTIFY, SPECIAL SERVICES UNIT, DEPARTMENT OF CORRECTIONAL SERVICES
P.O. BOX 94661, (STATEHOUSE STATION), LINCOLN, NEBRASKA 68509-4661
TELEPHONE: (402) 479-5785, AFTER HOURS: (402) 471-3330
DIAGNOSTIC AND EVALUATION CENTER ORI NB055035C

GOVERNMENT EXHIBIT 1 8:04CR 44 3-30-04

DCS-T-scc-001-pc