# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 15-2202

———————————————

Bruhn Farms Joint Venture

*Plaintiff - Appellant*

v.

Fireman's Fund Insurance Company

*Defendant - Appellee*

——————————

Appeal from United States District Court
for the Northern District of Iowa - Sioux City

——————————

Submitted: February 11, 2016
Filed: May 25, 2016

——————————

Before SHEPHERD, BEAM, and KELLY, Circuit Judges.

——————————

BEAM, Circuit Judge.

Bruhn Farms Joint Venture (Bruhn) appeals the district court's grant of summary judgment in favor of Fireman's Fund Insurance Company (Fireman's) in this insurance dispute over the adjusted value of hail-damaged crops in northwest Iowa. Because a factual dispute remains regarding the adjustment of this claim, we reverse and remand to the district court for further proceedings.

## I.    BACKGROUND

Rural Community Insurance Services (RCIS), acting as managing general agent for Fireman's, issued a policy of crop-hail insurance to Bruhn. The policy afforded coverage during the 2012 crop year for direct loss due to hail and certain other specified perils. Bruhn sustained a significant hail loss on September 11, 2012, and reported that loss to RCIS. Adjustment of the loss was assigned to RCIS adjuster Galen Sornson. Although the loss occurred in early September, Bruhn had still not heard from RCIS or its adjusters in mid-October. Accordingly, Bruhn requested and obtained approval from RCIS to harvest its crops and leave check strips for the adjusters. Because the loss potentially involved more than 5,000 acres, a six-person team was assembled to work the loss. The team of adjusters did not arrive at the Bruhn farm until October 29, 2012,[1] more than a month after receiving notice of the loss, during which time harvest had occurred and volatile weather conditions persisted in Iowa. Indeed, according to Alan Bruhn (Alan), a partner of Bruhn, weather conditions were cold and windy on the two days that the adjusters were in the fields counting check strips, and the adjusters spent a considerable amount of time in the barn and in their trucks, trying to warm up. Bruhn's expert opined that the adjusters could not have spent a sufficient amount of time in the fields over those two days to properly adjust a claim covering the number of acres over which Bruhn had reported damage.

Nonetheless, the adjusters purportedly completed their counts using the check strips that had been left in the fields and reported that sufficient check strips were left in each field to complete the adjustment process. According to their survey sheets,

_____

[1]Fireman's contends the field inspection occurred a week earlier, on October 22-23. Given that Bruhn is the nonmovant, we accept Bruhn's version of the factual record and note that the record indicates that at least two adjusters who completed the field review (including Sornson) stated that the adjustment occurred on October 29-30.

the adjusters determined that 4,120.5 acres of soybeans had payable hail losses. Based on the crop-hail loss-adjustment procedures set forth in the respective National Crop Insurance Services (NCIS) manuals, the RCIS adjusters found losses ranging from 2.3% to 71.4%. On October 30, Sornson completed the proof of loss for the September 11 claim. Sornson attempted to meet with Alan to discuss the claim on October 30 before leaving the Bruhn farm, but Alan was sick and unable to meet. Sornson faxed a copy of the proof of loss to Alan on November 5, 2012.

Bruhn did not agree with the adjusters' calculations and Alan refused to sign the proof of loss. Sornson's supervisor conducted a review of the Bruhn claim in late November 2012 and determined that the loss had been properly adjusted in accordance with NCIS crop-hail procedures. On November 28, 2012, despite Bruhn's disagreement and without its approval or Alan's signature, RCIS issued payment to Bruhn for the amount RCIS had determined was payable for the losses: $417,636 for the loss, less a premium credit of $184,578, for a net payment of $233,058. A check in that amount was delivered to Alan's residence via FedEx on December 4, 2012.

After the check was delivered, Alan directed his insurance agent, Terry Nielsen, to inquire as to how he could dispute the paid amount. Nielsen, in turn, contacted Rod Nelson, the manager of RCIS's Regional Service Office. According to Nielsen, Nelson suggested that in order to reconsider the loss determination, the insurance company would look at records of historical yields. It was Nelson's recollection that Nielsen was the one who suggested looking at historical yields, although Nelson agreed in his deposition that looking at historical yield numbers would be part of the process. The next incident of note occurred on December 15, 2012, when Nielsen inquired of Nelson about the status of the claim, and Nelson responded via text message that they were "one drink away" from settling Bruhn's claim. However, when contacted the next day, Nelson stated that there was nothing further RCIS could do with regard to Bruhn's claim.

Following this news from Nelson, Alan met with Larry Burkhart, RCIS's Crop-Hail/Named Peril Field Claims Manager, on December 18, 2012. During the meeting, Burkhart also advised Alan that he would conduct a review of the claim and would, among other things, look at Bruhn's historical yields. Alan contended that his historical yield records would result in a much higher payment. During the meeting, Alan contends Burkhart told him to be patient while they gathered information and considered the claim, because the claim had been mishandled. Nielsen alleges that several weeks later, Burkhart advised him they were about $25,000 apart on the claim, somewhere in the neighborhood of $900,000. Nielsen relayed this information to Alan, who directed him to settle for the lower number. However when Nielsen contacted Burkhart to tell him Alan was willing to take the lower number, Burkhart retreated, and instead informed Nielsen that after reviewing the available information, he concluded that RCIS's original loss determinations were correct. On January 25, 2013, Burkhart sent a letter to Bruhn indicating that RCIS had completed the review and determined that the claim was properly adjusted and paid.

Bruhn commenced this action in Iowa state court on October 3, 2013, against Fireman's. The petition alleged a breach of contract and also contended that punitive damages were appropriate due to the bad-faith refusal to pay the claim. Fireman's removed the case to federal court, invoking the court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). The parties unanimously consented to trial, disposition and judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(3). Upon motion, the court granted summary judgment in favor of Fireman's, finding that it had not breached the contract because Fireman's followed NCIS guidelines in determining the amount of loss, and that in any event, Bruhn did not ask for an independent appraisal as provided for in the insurance contract. The court additionally held that in the absence of a breach of contract, Fireman's position with respect to the claim was fairly debatable, and thus the claim for bad faith failed. Bruhn appeals.

## II.    DISCUSSION

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A material fact is one that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We review the evidence in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Because the basis for our jurisdiction is diversity of the parties, Iowa law controls, and we review the district court's interpretation of Iowa law and its grant of summary judgment de novo. Praetorian Ins. Co. v. Site Inspection, LLC, 604 F.3d 509, 513, 515 (8th Cir. 2010).

Bruhn currently contends[2] Fireman's breached the contract in three ways: by

---

[2]Fireman's argues that Bruhn did not advance these arguments before the district court, and we thus cannot consider them on appeal. However, we find that these theories were pleaded in the complaint. See Pl.'s Compl. ¶ 24, J.A. 11. And having examined the record, we find there is more than sufficient evidence adduced at the summary judgment stage to reveal a factual dispute about whether a breach of contract occurred based upon these theories. Numerous excerpts of deposition testimony in the record tend to support Bruhn's theory that the claim adjustment process was unduly delayed, that Bruhn never agreed to the amount that was paid, and that by the time it was clear there would be no agreement between the insurance company and Bruhn, the opportunity for an independent appraisal had passed. Further, Bruhn introduced an expert report addressing the substance of these arguments. Even if that were not the case, in certain instances we have discretion to consider arguments not advanced below, and we exercise that discretion in this case.

paying the loss without reaching agreement with Bruhn, in violation of § 3(b) of the policy; by failing to invoke the appraisal procedure, in violation of § 6 of the policy; and by failing to follow the NCIS shatter loss procedures when determining percentage of the loss, in violation of policy § 3(c). We find that there is a factual dispute with respect to at least the first two of these contentions.

In a breach-of-contract claim, the complaining party must prove the existence, terms, and conditions of the contract, that he has performed all of the terms and conditions required under the contract, but that the defendant breached the contract and caused him damages. Molo Oil Co. v. River City Ford Truck Sales, Inc., 578 N.W.2d 222, 224 (Iowa 1998). A party breaches when he fails to perform part of the contract without legal excuse. Id. Section 3(b)(2) of the policy states that it is the insurance company's duty to "[p]ay the loss within 30 days after we reach agreement with you, entry of a final judgment, or the filing of any appraisal award with us." Section 6 of the policy states that if the insured and insurer "fail to agree on the percentage of loss," then "[o]ne of us will demand in writing that the percentage of loss be set by appraisal." Reading these provisions together, we find there is a factual dispute about whether Fireman's breached its obligations to its insured in this case.

Bruhn contends Fireman's breached the agreement by tendering payment for the loss without first reaching agreement with Bruhn, without entry of a final judgment, and without the filing of any appraisal award, in violation of policy § 3(b)(2). Fireman's contends that the provision merely provides a payment deadline,

_____

See Warren v. City of Lincoln, 864 F.2d 1436, 1439 (8th Cir. 1989) (en banc) (holding that while we generally do not consider arguments not advanced below, we may do so where the record is fully developed); see also United States v. Lucas, 499 F.3d 769, 789 (8th Cir. 2007) (en banc) (Beam, J., dissenting) (noting that the majority rested its holding in part upon theories and arguments raised for the first time in a petition for rehearing en banc).

not a condition precedent to payment issuance. We disagree that the section provides only a deadline to pay, as it is the only instance in the contract mentioning Fireman's duty to pay. Reading this section as *only* providing a deadline would thus effectively eliminate the duty to pay. And, when read in connection with the appraisal provisions of § 6, it seems that the policy's framework ideally intends for the insured and the company to come to an agreement without the need to resort to litigation. Instead of coming to an agreement, however, Fireman's unilaterally tendered a payment to Bruhn. Nielsen testified in his deposition that he had not known an insurance company to issue a check without the agreement or approval of the insured in his thirty-five years in the insurance agent business. Bruhn's expert also indicated that remitting payment without the insured's agreement was an unusual procedure. Thus, Fireman's attempt to pay the claim without the agreement of Bruhn speaks to the irregularity of proceedings that occurred in processing this claim.

Once Fireman's tendered payment well below Alan's expectations, Alan and his agent immediately let RCIS officials know that he disagreed with the loss calculations. This was likely sufficient to trigger an appraisal. However, discussions between RCIS officials and Bruhn or its agent Nielsen continued from early November into January. While Bruhn did not specifically demand an appraisal, it claims this is because it was led to believe that Fireman's adjuster would change the amount after reviewing the historical yields. By the time Bruhn realized this would not occur, it was too late for an appraisal and the workable evidence (check strips) had, by that time in late January, been naturally destroyed. Alan testified that he was under the impression the loss would be reworked and reevaluated up until the time when it was finally denied in mid-to-late January. The policy does not place the burden exclusively upon Bruhn to invoke the appraisal procedure. Nor does the policy specifically place the burden on Fireman's. But, Fireman's drafted the policy, and at the very least there is a factual dispute over who should have invoked the policy's language regarding the appraisal procedure. Hornick v. Owners Ins. Co., 511

N.W.2d 370, 374 (Iowa 1993) (holding that it is the insurer's duty to define terms in clear and explicit language).

To the extent that Fireman's again complains that this theory was not advanced below, we note that in Bruhn's answer to interrogatory number eleven, which the district court heavily relied upon in granting summary judgment, Bruhn alleges that "the company denied Bruhn the opportunity to have an independent appraisal of the loss which is afforded under the policy." Fireman's alleges Bruhn was free to pursue the appraisal option at any point. However, given the allegedly misleading adjustment activity by Fireman's after the check strips were destroyed, a factfinder should decide whether, how, and who should have invoked the appraisal procedure, which invocation would have allowed the parties to come to an agreement over the amount of the September 11, 2012, hail loss.

This leave us with Bruhn's claim for bad-faith refusal to pay. Bad-faith claims require proof of the absence of a reasonable basis for an insurance company's denial of the claim, and that the company had knowledge or recklessly disregarded knowledge that its denial was without reasonable basis. Dolan v. Aid Ins. Co., 431 N.W.2d 790, 794 (Iowa 1988). The first element is objective, and the second, subjective. Bellville v. Farm Bureau Mut. Ins. Co., 702 N.W.2d 468, 473 (Iowa 2005). An insurance company has the right to dispute claims that are fairly debatable without being subject to a bad-faith tort claim. Gardner v. Hartford Ins. Accident & Indem. Co., 659 N.W.2d 198, 206 (Iowa 2003). Although Fireman's did not completely refuse to pay the claim, its payment of less than the full amount, if that occurred, can also be the subject of a bad-faith claim. See Chadima v. Nat'l Fid. Life Ins. Co., 55 F.3d 345, 346, 350 (8th Cir. 1995) (applying Iowa law, allowing bad-faith claim to be decided by the factfinder when the insurance company paid about $91,000 on a claim alleged to be worth over $136,000).

Because we decide that there is an issue of fact as to whether Fireman's breached the insurance contract, and because the factual issues in the breach claim are relevant to the bad-faith claim, this claim survives summary judgment as well. Numerous instances of conduct by the insurance representative and adjusters at the very least raise jury issues on bad faith, most specifically the delay in adjusting the fields and then, for the next several months, leading Bruhn to believe that the claim would be favorably settled without having to go through the hassle of a joint appraisal. See A.W.G. Farms, Inc. v. Fed. Crop Ins. Corp., 757 F.2d 720, 728-29 (8th Cir. 1985) (holding that the federal crop insurance agency led farmers down a "primrose path" that ultimately resulted in the defeat of the insurance claim, contrary to the covenant of good faith and fair dealing implied in every contract). There was also evidence that RCIS officials and adjusters found it difficult to get in touch with Alan, and that he had been difficult to work with on past claims. Alan and his agent Nielsen claim that they were readily available and were aggravated throughout the month of October that the adjusters had not yet inspected his fields. Although Fireman's argues that the delay in adjusting the claim was due to Alan's conduct, Sornson's notes indicate that the insurance company had to wait for help from more adjusters, and this caused a delay in adjusting the fields. All of the foregoing points to the myriad factual disputes running through this case. Specifically with regard to bad faith, however, given that the evidence in the fields was subject to spoliation, and the fact that the claim was not finally decided until January when the evidence was necessarily gone, there remains a factual dispute on that issue. See Chadima, 55 F.3d at 350 (holding there was sufficient evidence from which a reasonable jury could decide that the insurer had no reasonable basis for underpaying the claim).

## III. CONCLUSION

We reverse and remand for further proceedings.

_____